**Jeffrey HVORCIK, et al., Plaintiffs,**

v.

**Michael SHEAHAN, Sheriff of Cook County, et al., Defendants.**

No. 92 C 7329.

United States District Court, N.D. Illinois, E.D.

March 24, 1994.

---

Thomas G. Morrissey, Chicago, IL, for plaintiffs.

Robert D. Quinlivan, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Three of the four named plaintiffs—Jeffrey Hvorcik ("Hvorcik"), James Poloncasz ("Poloncasz") and Vincent Hedge ("Hedge")[1]—were arrested on the basis of invalid arrest warrants—warrants that at one time had been legitimate but, unknown to the arresting officers, had since been recalled (quashed) by the courts. Although warrants themselves are issued by the courts in the first instance, the warrant records in Cook County are maintained by the Sheriff's office. Plaintiffs now bring this three-count class action[2] against Cook County Sheriff Michael Sheahan ("Sheahan" or the "Sheriff") in his official capacity, charging him with (1) illegal custodial detention ("seizure" within the meaning of the Fourth Amendment[3]) in violation of their civil rights under 42 U.S.C. § 1983 ("Section 1983"), (2) false arrest under state law and (3) civil contempt of court, also a state law claim.

Plaintiffs now move for summary judgment as to liability (not as to damages) on all counts pursuant to Rule 56, while Sheahan in his turn moves for summary judgment on the ground of his claimed Eleventh Amendment immunity.[4] For the reasons set forth in this memorandum opinion and order, plaintiffs' motions are denied as to all of the named plaintiffs but are granted as to the class, while Sheahan's motion is denied.

### Facts

Warrants issued by the Circuit Court of Cook County are tracked in three independent ways: by the Clerk of the Circuit Court, by the Illinois State Police and by the Sheriff's Department, the latter through the Sheriff's Fugitive Warrants Division ("FWD"). FWD is headquartered in the "Central Warrants Office" at 26th and California in Chicago, but it also operates offices staffed by the Sheriff's warrant clerks in all suburban districts. One of FWD's primary responsibilities is to maintain the Sheriff's Police Warrant Computer System ("SPWA"), a records repository for about 125,000 active warrants.

Judicial orders are of course the means both for giving life to warrants and for later depriving them of such life. To process the quash and recall orders ("recall orders") after they are signed by judges, each Circuit Court Judge is assigned a deputy court clerk who works for Clerk Aurelia Pucinski ("Pucinski"). Although each courtroom is also assigned a deputy sheriff, the mission of those deputies is strictly security—they have

1. Nothing in the parties' submissions provides any information as to the fourth named plaintiff, Paul Sandelski.

2. On July 2, 1993 this Court determined that this action would be maintained as a class action under Fed.R.Civ.P. ("Rule") 23(b)(3). On July 12 the class was certified as covering all persons who have been arrested, detained for additional time and/or required to make a separate court appearance based upon invalid warrants.

3. As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the Fourth Amendment's underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

4. Familiar Rule 56 principles impose on each movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to each nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Where as here cross-motions are involved, that principle thus demands a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions (see *Camelot Care Centers, Inc. v. Planters Lifesavers Co.*, 836 F.Supp. 545 (N.D.Ill.1993)).

no responsibility for the recall orders. Instead the Sheriff's Office is kept apprised of the status of outstanding warrants by the Sheriff's FWD warrant clerks assigned to the various municipal districts—it is their job to enter into the SPWA the data transmitted from the Clerk's Office.[5]

That transfer of information takes place when a Clerk's Office employee places one of the four color-coded copies of the recall order in a basket for pickup by the Sheriff's people, typically within two to five days after the order is issued.[6] In addition, the Clerk's Office also provides the Sheriff's Office with a monthly list of recall orders entered for all non-traffic cases, and the Sheriff's Office then compares that listing to its own list of warrants reported as active on the SPWA.

That "cross-checking" procedure has been conducted regularly since 1988. Throughout the relevant time period the task was performed by Investigator Ralph Willer ("Willer"), and P.Ex. 31 contains a compendium of his monthly reports beginning in July 1991 (D.Exs. 4 and 5 are his reports from 1990 and 1989, respectively). By cross-checking against the Clerk's list, Willer typically catches and removes from the SPWA between 49 to 100 warrants per month that, though listed as active, should have been recalled but were not for one reason or another.

Three warrants that were not successfully purged from the system led to the arrests of Hvorcik, Poloncasz and Hedge, all in the Fourth Municipal District. Each of them was arrested when a recalled warrant (stemming from since-resolved misdemeanor charges) was incorrectly classified as active at the time that a law enforcement officer ran a computer check. This opinion later deals with the specifics of those events.

---

**5.** FWD warrant clerks are also responsible for forwarding certain data to the Illinois State Police Law Enforcement Data System ("LEADS"), a similar database maintained by the state police.

**6.** Another copy of the recall order is contemporaneously sent for entry in the Clerk's own computer database.

**7.** Ill. Const. art. 7, § 4(c) creates the office of sheriff for each county. Within the sheriff's pre-

### Section 1983 Claim

■ Because under Illinois law Sheriff Sheahan in his official capacity is the ultimate decisionmaker in his area of Illinois' governmental structure[7], the analysis of plaintiffs' Section 1983 claim begins with the familiar decision in *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). *Monell, id.* charted the necessary elements of such a claim as (1) a deprivation of a constitutionally protected interest (2) caused by an official policy, custom or usage of the governmental entity (accord in the context of a wrongful-warrant-based arrest, *Powe v. City of Chicago,* 664 F.2d 639, 643 (7th Cir.1981)).

### 1. *Deprivation of a Constitutional Interest*

Even with reasonable factual inferences drawn in Sheahan's favor, the initial hurdle of showing a constitutional deprivation (in this instance impinging on Fourth and Fourteenth Amendment rights) poses no difficulty for plaintiffs. *Murray v. City of Chicago,* 634 F.2d 365, 366 (7th Cir.1980) has put the matter succinctly:

> It seems clear that appellant·sustained a violation of constitutional rights by being arrested and detained pursuant to an invalid warrant.

Indeed, Sheahan essentially concedes that plaintiffs have suffered a deprivation of the requisite constitutional gravity,[8] for his submissions focus exclusively on the second *Monell* prong (D.Mem. 2, 9–23). This opinion therefore turns to that issue.

### 2. *Official Policy, Custom or Usage*

■ *Monell* is perhaps best known for its negation of respondeat superior liability under Section 1983 (436 U.S. at 691)—for the proposition later articulated (for example) in

---

scribed range of activity, he and not some legislative-type body is at the apex of the governmental pyramid.

**8.** D.Mem. 2 even refers in passing to plaintiffs' "unlawful arrests" before moving on to develop the argument that the arrests were nonetheless nonactionable.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986):

> *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"— that is, acts which the municipality has officially sanctioned or ordered.

Obviously even a single decision or action by the legislative body that governs a municipality—or given the status of a sheriff under Illinois law, a single decision or action by Sheriff Sheahan himself—will meet that test for Section 1983 purposes (*id.*). But when a plaintiff points to the conduct of anyone farther down in the pecking order, courts have required a showing that the conduct may fairly be laid at the doorstep of the ultimately authorized decisionmaker or decisionmakers (*id.* 475 U.S. at 480–81, 106 S.Ct. at 1298–99)—hence the regular case law references to "official policy, custom or usage."

It goes without saying that Sheriff Sheahan has not promulgated an actual directive to any officers to arrest and detain suspects on warrants that have already been recalled (see *Mitchell v. Aluisi,* 872 F.2d 577, 579 (4th Cir.1989) ("There is no evidence of a policy anywhere in Prince George's County to serve invalid warrants")). Hence plaintiffs must look to the *Monell*-taught doctrine well summarized in *McNabola v. CTA,* 10 F.3d 501, 511 (7th Cir.1993) (citations from other Courts of Appeals omitted):

> In the absence of a formal policy, [plaintiff] must rely on *Monell*'s custom or practice prong to establish a basis for municipal liability. *Monell* authorizes the imposition of liability against a municipal entity "for constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. at 690–91, 98 S.Ct. at 2036; *see also Pembaur,* 475 U.S. at 482 n. 10, 106 S.Ct. at 1300 n. 10. We explained in *Cornfield* [*v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316, 1326 (7th

Cir.1993)] that "a practice of unconstitutional conduct, although lacking formal approval, may provide a basis for municipal liability" if the plaintiff can establish that the policymaking authority acquiesced in a pattern of unconstitutional conduct. 991 F.2d at 1326; *see also Felton v. Board of Commissioners,* 5 F.3d 198, 203 (7th Cir. 1993). A municipal "custom" may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice. The longstanding or widespread nature of a particular practice would support the inference that policymaking officials "must have known about it but failed to stop it." [9]

In this instance all of the claimed "customs" or "practices" are cast in terms of the Sheriff's derelictions rather than his affirmative behavior. Every factor identified by plaintiffs as causing the violations of their constitutional rights is based on an omission, a failure to take precautionary steps that would have averted the unjustified arrests: failure to conduct satisfactory cross-checks, failure to train and supervise, failure to heed the warnings of various officers concerning the deficiencies in the system, failure to provide suburban police forces with validation printouts, failure to include misdemeanors and traffic offenses among the validation procedures to clear out dead warrants.

That omission-to-act approach to Section 1983 has been applied at the highest possible judicial level (see, e.g., *City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (failure adequately to train police officers may constitute "city policy" even if "[i]t may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees"). *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 822–23, 105 S.Ct. 2427, 2435–36, 85 L.Ed.2d 791 (1985) had earlier explained that while the term policy "generally implies a course of action consciously chosen from among various alternatives," it can also en-

**9.** [Footnote by this Court] Accord, *Jones v. City of Chicago,* 856 F.2d 985, 996 (7th Cir.1988):

As the custom was department-wide and of long standing, the jury was entitled to con-

clude that it had been consciously approved at the highest policy-making level for decisions involving the police department....

compass a practice such as "inadequate training." But in any such case "evidence [must] be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate" (*id.* at 823, 105 S.Ct. at 2436).

Drawing on that standard, our own Court of Appeals requires "a high degree of culpability" before a municipal policymaker will be held liable for a failure such as an inadequate training program (*Cornfield*, 991 F.2d at 1327). Thus "deliberate indifference" to the rights of the aggrieved plaintiff has become the benchmark for such a claim (*id.*, quoted in the next paragraph of this opinion). And of course the *City of Canton* approach and the "deliberate indifference" test are not limited to failure-to-train cases. But because the required proof of "deliberate indifference" may vary depending on the claimed delinquency on the defendant's part, this opinion turns to the meaning of that concept in the context of this case.

### 3. *Deliberate Indifference*

As just suggested, the cases teach that "deliberate indifference" can connote different states of mind in different contexts (see, e.g., *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("unnecessary and wanton infliction of pain" shows "deliberate indifference to serious medical needs of prisoners"); *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986) (during prison emergencies deliberate indifference involves actions taken "maliciously and sadistically for the very purpose of causing harm"). *Cornfield*, 991 F.2d at 1327 (quoting *City of Canton*, 489 U.S. at 389, 109 S.Ct. at 1205) has recently spoken to that subject in a manner that defines the task for this Court:

> Deliberate indifference itself is an elusive standard. The Supreme Court reasoned that policymakers would be deliberately indifferent when "in light of the duties assigned to the specific ... employees[,] the need for more or different training is

so obvious, and the inadequacy so likely to result in the violation of constitutional rights." In order to ensure that isolated instances of misconduct are not attributable to a generally adequate policy or training program, we require a high degree of culpability on the part of the policymaker. Coupled with a causation requirement, this standard ensures that the violation alleged is not too far removed from the policy or training challenged as inadequate. Taken together, these two considerations amount to a requirement that liability be based on a finding that the policymakers have actual or constructive notice that a particular omission that [sic] is likely to result in constitutional violations. Otherwise, we would risk creating *de facto respondeat superior* liability, which is contrary to *Monell.*

In those terms the question is whether Sheriff Sheahan as the policymaker has had "actual or constructive notice" that the omissions asserted by plaintiffs are "likely to result in constitutional violations."

Sheriff Sheahan shifts the thrust of that inquiry a bit by attempting to minimize the pervasiveness of instances of systemic malfunctions, thus touching off a debate about just how widespread the problem is (D.Mem. 10 says "There is no statistical evidence that arrests on invalid warrants represent a significant systemic problem ...," while P.Mem. 9 says that arrests based on invalid warrants "have continued to occur with shocking frequency"). Although a summary judgment motion would of course be an inappropriate vehicle for resolution of factual disputes in that respect, that specific quarrel is really beside the point because a single constitutional injury can of course trigger Section 1983 liability (thus *Pembaur*, 475 U.S. at 478 n. 6, 106 S.Ct. at 1297 n. 6 reconfirms the teaching of *City of Oklahoma City* that a single application of unconstitutional policy is enough). Although the record contains unrebutted evidence indicating the endemic nature of the problem of invalid warrants and consequent invalid arrests and detentions,[10]

---

**10.** P.Ex. 28 is an October 12, 1990 memorandum compiled by warrant clerk Cathleen Shaver reflecting that invalid warrants were served on an

average of three times per week in her district alone and were being served "more and more often." P.Ex. 31 is a group exhibit comprising a

what controls on this facet of the case is that no plaintiff is under any obligation to prove any injuries beyond his or her own.

One way in which the pervasiveness of the problem (or lack of it) *would* be relevant could be on the *Monell* prohibition of respondeat superior liability—that is, the question whether Sheahan himself (as opposed to his subordinates) had actual or constructive knowledge of recurrent abuses. But that is not an issue that Sheahan has staked out—on the contrary, he has essentially conceded his awareness of the need for procedural changes. Apparently recognizing the existence of ample evidence to create constructive notice of his office's defective procedures,[11] Sheahan responds to the deliberate indifference accusation by contending that he has adopted policy modifications to remedy the shortcomings. Sheahan maintains that his improvements belie any finding that "the need for more or different [procedures] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" (*Cornfield,* 991 F.2d at 1327).

Here are the five steps that Sheahan Mem. 14 characterizes as his "good faith efforts" that "negat[e] plaintiffs' charge of deliberate indifference":

1) document the problem and report shortcomings of the system to the Clerk's Office ( [P. 12(n)(1) ¶ 112 [12]);

2) request and use the Clerk's quash list to locate invalid warrants ( [*id.* ¶ 105);

3) send the SPWA report to local police departments with a request that they cross-check for invalid warrants and report results back to the FWD to cancel warrants from SPWA ( [*id.* ¶ 118);

4) attend Information Systems Subcommittee meetings chaired by Cook County Circuit Court Clerk Pucinski ( [*id.* ¶ 112); and

5) request and receive access to the Clerk's case history computer through terminals installed at Central Warrants for the purpose of investigating the status of warrants ( [*id.* ¶ 102).

But although those asserted "steps to improve the system" (Sheahan Mem. 14) surely do not evidence an affirmative desire to harm people in plaintiffs' position (the concept of "deliberate indifference" in the *Whitley v. Albers* context), those "steps" are so meaningless in the face of known inadequacies that they show deliberate indifference to those inadequacies and to the inevitable harm imposed on members of the plaintiff class, in the less demanding sense explained by *Cornfield.*[13]

As for the first of those asserted steps, the idea that Sheahan "document[ed] the problem" (a questionable proposition in itself) has no real relevance other than to reinforce the knowledge component of his deliberate indifference. Similarly, the related fourth step [14]

series of Willer reports in which he continually catches upwards of fifty missed quashes per month—and each report concludes with the statement that "each of these warrants represents a potential lawsuit that was avoided...."

**11.** For example, the 1988 audit conducted by the Illinois state police found the Sheriff's Office to be in poor compliance with LEADS regulations—see P.Ex. 36, identifying various defects in Sheahan's warrant-recalling system.

**12.** This District Court has implemented Rule 56 by promulgating General Rule ("GR") 12(m) and 12(n), requiring summary judgment movants and respondents to tender statements that identify the presence or absence of factual disputes. This opinion refers to those statements by listing the filing party ("P." or "D.") first, then citing to "12(m)" (for a movant's GR 12(m) statement of assertedly uncontested facts) or "12(n)(1)" (for the GR 12(n)(1) response to the movant's GR 12(m) statement) or "12(n)(2)" (for the GR

12(n)(2) statement of added facts by the responding party). Where a paragraph in a party's GR 12(n)(1) response does not dispute the movant's corresponding GR 12(m) paragraph, only the latter will be cited.

**13.** This Court's colleague Honorable William Hart has issued several opinions in a case asserting similar Section 1983 claims against Sheriff Sheahan and a number of other defendants, *Ruehman v. Village of Palos Park,* No. 91 C 8355. As explained later, in material part one of those opinions (842 F.Supp. 1043 (N.D.Ill.1993), cited here simply as *"Ruehman* at —") reaches the same conclusions as are reflected in certain aspects of this opinion.

**14.** D. 12(n)(1) ¶ 112 states in relevant part:

Willer met with Frank Bailey and Dennis McNamara, supervisors with the Clerk's office on many occasions and reported that the Sheriff's office was not receiving quash/recall or-

does not explain how Willer's conferences with Clerk Pucinski's people serve to defeat Sheahan's liability, although he seems to imply that the real fault is entirely that of the Clerk. But this Court's June 1, 1993 opinion (the "Opinion," 1993 WL 192948, at *1, 1993 U.S. Dist. LEXIS 7569, at *3–*5) has already reminded the Sheriff that *Murray*, 634 F.2d at 366 forecloses efforts by defendants "to 'get off the hook' by merely pointing the finger at each other." [15] Sheahan must own up to the fact that if the warrant recall system as a whole was proving unreliable and error-prone, his continued reliance on that system could not be justified. Indeed, if anything Sheahan's first "step" cuts the other way: Despite his awareness of the problem, he took no measures to minimize its flaws (one such obvious change would be to have his own people get one of the color-coded copies of each recall order directly, rather than awaiting the delivery from the Clerk's Office personnel).

Sheahan's second step, employing cross-checks against the Clerk's quash list, is in much the same category: It provides only limited protection for members of the plaintiff class, and its patent deficiencies were not met by any efforts on Sheahan's part to improve matters. Thus Sheahan points to the fact that each month [16] a "quash list" (typically listing between 3,000 to 3,500 cases) has been provided to the FWD by the Clerk's Office to enable Willer to purge any recalled warrants incorrectly listed (for whatever reason) on SPWA as active (D. 12(m) ¶¶ 27–28). But importantly those quash lists comprise only *felony* cases (*id.* ¶ 27; Makow-

ski Dep. 63–64, 66), while large numbers of the members of the plaintiff class are persons picked up on invalid *misdemeanor* warrants, which are wholly unaffected by the cross-checking procedure (D. 12(m) ¶¶ 41, 62, 90).[17] If anything, Sheahan's practice of cross-validating felony warrants confirms his knowledge of the need for such a measure to avoid unwarranted [18] arrests and detention, thus underscoring his indifference to the identical (and wholly uncured) problem that confronts persons who are named in already-recalled misdemeanor warrants.[19]

In response Sheahan contends that he was not in charge of the formation or composition of the quash lists, because the types of cases (felony, traffic or misdemeanor) includable on the lists is dictated by codes "left in the hands of a state judicial officer, the Chief Judge of the Circuit Court of Cook County ( [D. 12(n)(1) ¶¶] 42–44)" (D.Mem. 12). That being so, Sheahan says that he "had no control over the coding of the warrant quash list or the Clerk's computer system generally and cannot be deemed to have final decision-making authority over the system as a method of validating the SPWA data base" (*id.*; see also D. 12(n)(2) ¶ 128; Pucinski Dep. 71–73)).

Because that formulation of the problem asks the wrong question, it necessarily delivers the wrong answer. Although Clerk Pucinski's deposition (on which Sheahan relies for this point [20]) alludes to the Chief Judge's decision-making authority with respect to codes for traffic matters and is silent as to all other types of warrants, it may be assumed arguendo that state law also vests ultimate

ders. Willer attended a meeting of the Informational Systems Subcommittee chaired by Aurelia Pucinski and reported the problem directly to the Clerk of the Circuit Court. Willer Vol. III 50–61.

15. *Ruehman* at 1048 dismissed the official capacity damage claims against Clerk Pucinski by the plaintiffs in that case because the Clerk of the Circuit Court was not a suable entity.

16. Drawing reasonable inferences in Sheahan's favor, this opinion assumes that the validation process over which the parties are now bickering has operated in more or less the same way since 1988 (Willer Dep. 104; see also Makowski Sept. 14, 1993 Dep. 39).

17. It is somewhat disturbing that Sheahan's counsel appears to downplay this deficiency by acknowledging only that the cross-checking lists do not contain traffic cases, but not that they also omit misdemeanors (see D. 12(n)(1) ¶ 105).

18. Bad pun intended.

19. Indeed, the absence of cross-validation for traffic cases was a major factor that led Judge Hart initially (*Ruehman* at 1051) to agree with one of the plaintiffs in that case.

20. Sheahan cites to his D. 12(n)(1) ¶¶ 42–44 (which in turn cites Pucinski's Dep. 7–11 and 71–74) and to his D. 12(n)(2) ¶ 128 (which also relies on Pucinski's testimony).

authority for coding misdemeanor warrant quashes with the Chief Judge as well. But that is really a red herring, because what is at issue is nothing more nor less than the formulation of a computer program—a purely mechanical task.[21] And Sheahan is unquestionably the final policymaker in his own sphere, able to request such a modification to correct a glaring imperfection in his own FWD system.[22]

Yet nothing in the record even hints that Sheahan ever attempted to do anything to modify the coding arrangement. Sheahan does not suggest that he addressed even the most minimal of inquiries to the judiciary about obtaining access to the misdemeanor data, much less that he was rebuffed in that endeavor. Again it would be difficult to postulate a more conclusive showing of his indifference to the known threat to the constitutional rights of persons in plaintiffs' position. This opinion will later discuss Sheahan's admission that an independent mechanism exists for his acquiring the exact data at issue: direct access to the Clerk's database. More on that later, but for now it is plain that the judicial control over the coding process does not absolve Sheahan.

To return to Sheahan's several "steps," the third of them refers to his sending SPWA reports to local police departments for additional cross-validation. In the same curious way that he has invoked a cross-checking procedure that is critically impaired because it wholly omits misdemeanor warrants, here Sheahan refers to a once-partially-effective practice that has since been changed for the worse. Until 1988 the Sheriff's FWD sent monthly computer printouts of all active warrants to six or seven randomly selected suburban police departments (P.Mem. 24), a procedure that enabled those few police forces to eliminate many invalid warrants from their active rolls (P. 12(m) ¶¶ 126–28). But even that partial procedure was discontinued after Willer became the LEADS coordinator in 1988 (D. 12(n)(1) ¶ 122). Instead of universalizing a practice that had proved effective in the limited areas of its operation, the FWD's new practice is to eschew any distribution unless requested specifically by one of the police departments (P. 12(m) ¶ 122). Only a warped perspective could view a step backward as evidence of Sheahan's having addressed a known problem rather than exhibiting indifference to it.

Sheahan's final step that supposedly "negat[es] plaintiffs' charge of deliberate indifference" (D.Mem. 14) points to his efforts to secure access to the Clerk's databases through terminals installed at Central Warrants. Again an examination of the facts demonstrates the emptiness of Sheahan's purported remedial action. Here is how his D. 12(n)(1) ¶ 102 responds to the statement in P. 12(m) ¶ 102 that "[t]he practice and procedure of the FWD is not to check the clerk's terminal after a hit to determine if the warrant has been quashed, recalled or executed":

> Since 1990, the FWD has had access to the Clerk's case history computer 23 hours a day. When the FWD has reason to suspect that a warrant listed in SPWA as active has been recalled, the FWD personnel access the Clerk's computer to cross-check against SPWA. Willer Vol. I 69–72; Willer Vol. II 87–88.

To begin with, the ongoing service of dead warrants confirms that this completely reactive approach ("when the FWD has reason to suspect . . .") must necessarily be unsuccessful—it represents an imperfect attempt to lock the barn door after the horse (a plaintiff's constitutional right to be free from unreasonable seizure) has been stolen.[23] But

---

**21.** Indeed, plaintiffs' R. Mem. 33 asserts (though without citing any record reference) that "a code also exists for deleting misdemeanor warrants from the Clerks' [sic] computer. The Sheriff could ask the Clerk to supply a quash list for recalled or quashed misdemeanor warrants. The same method is available to the Sheriff for validating misdemeanor warrants as he has for felony warrants, but he does not bother to use it." Whether or not such a code now exists, there is no question that one could readily be formulat-

ed—and *that* is what dooms Sheahan's attempt at exculpation by pointing elsewhere.

**22.** Clerk Pucinski testified that her office actually seeks suggestions from judges and lawyers on developing new codes (Pucinski Dep. 73).

**23.** Indeed, although Sheahan denies it, plaintiff Poloncasz swears that he showed the arresting officers documentation proving that his warrant

more significantly, Sheahan's statement really admits that he has the effective *means* to cross-check warrants via the Clerk's computer but that he chooses to wait until some undefined "reason to suspect" manifests itself.[24] That acknowledgment is particularly damning. Plaintiffs' very arrests on previously recalled warrants are compelling evidence that Sheahan's failure to take the readily available means to purge such warrants can only be characterized as deliberately indifferent.

In sum, each of the "steps" that Sheahan has identified does nothing to defeat plaintiffs' Section 1983 claim. Instead those items really cement Sheahan's knowledge that an effective system to remove quashed warrants from the database is necessary to minimize (if not to eliminate entirely) the arrest and detention of persons against whom no valid outstanding warrants exist. And given that knowledge, Sheahan's total failure to take any of the measures readily available to him to improve the effectiveness of the system manifests deliberate indifference as a matter of law—to adapt *City of Canton,* 489 U.S. at 390, 109 S.Ct. at 1205 to this case, the "need for more or different [procedures] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [Sheahan as] the policymaker[] ... can reasonably be said to have been deliberately indifferent to the need." Just so, Judge Hart determined in *Ruehman* at 1054:

> No calculated attempt is made to eliminate traffic warrants (the type of warrant issued for Miller's arrest) that are incorrectly listed as active. The undisputed evidence is that there are large numbers of incorrectly listed traffic warrants, that the Sheriff's office had knowledge of this deficiency, and that there was no procedure in place for eliminating incorrect listings. Accordingly, it must be held that the Sheriff's policy in not maintaining accurate records of traffic warrants was deliberately indifferent to the constitutional rights of persons being subjected to arrests and detention on recalled warrants.

As to the plaintiff class, then, Sheahan is liable on the Count I Section 1983 claim to every class member as to whom Sheahan's demonstrated failures were a proximate cause of that class member's arrest or detention or both. This opinion turns to a consideration of the three named plaintiffs in those terms.

### 4. Causation

■ As just suggested, the holding as to Sheahan's deliberate indifference does not end the matter: Plaintiffs must also demonstrate that his failings were a proximate cause (not necessarily *the* proximate cause) of their constitutional harms,[25] for without causation there can be no Section 1983 liability (*Donovan v. City of Milwaukee,* 17 F.3d 944, 953–54 (7th Cir.1994); *Powe,* 664 F.2d at 650 ("under *Monell,* the crucial question is whether the unconstitutional acts complained of were *caused by* a policy or custom of the municipality")). On that score all of the three named plaintiffs fail to establish their entitlement to summary judgment.

*A. Hvorcik.* On April 11, 1989 Hvorcik failed to appear for his court date in connection with a misdemeanor battery charge. That nonappearance caused the issuance of a bond forfeiture warrant (P.Ex. 2), which was entered into the SPWA on April 18, 1989. When Hvorcik appeared in court on April 26 and moved to vacate the bond forfeiture, the judge granted the motion and issued an order recalling the warrant (P.Ex. 5, Recall No. 397697). Deputy Clerk Tammy Hurt ("Hurt") prepared the order for the judge's signature (Stevens Dep. 22) but mistakenly

---

had been recalled in the course of his frustrated attempt to avoid incarceration (P. 12(m) ¶ 18).

**24.** Even that enterprise is hamstrung by Sheahan's surprising D. 12(n)(1) ¶ 103 admission to P. 12(m) ¶ 103:

> None of the persons on duty in the FWD on the night shift know [sic] how to use the Clerk's Computer System to check whether a warrant

issued for a misdemeanor or felony listed as active by the SPWA has been indicated as quashed or recalled in the Clerk's Computer. Lyman Dep. Vol. II at 83.

**25.** Section 1983 liability is governed by the general principles of tort liability, including the tort concept of proximate cause (*Hibma v. Odegaard,* 769 F.2d 1147 (7th Cir.1985)).

wrote "6–6–89"[26] and not 4–11–89 as the date that the warrant had issued (*id.* at 23–24; P.Ex. 2).

When the inaccurate recall order was distributed under the earlier-described standard procedures, the April 11 warrant was understandably never removed from the SPWA (Stevens Dep. 34). While a handwritten notice (P.Ex. 6) that the bond forfeiture had been vacated and the warrant had been recalled was mailed by a deputy clerk to Hvorcik on April 18, that notice was never delivered to the Sheriff's Office (D. 12(m) ¶ 55; Stevens Dep. 28).

Several months later an unrelated stop of Hvorcik by a Cook County Sheriff's officer, followed by a routine check of the SPWA, consequently turned up the erroneous information that the quashed warrant was still active. That led to Hvorcik's being taken into custody (as he should not have been).

*B.  Poloncasz.* On November 4, 1991 Poloncasz failed to appear in court to answer misdemeanor charges pending against him, thus causing the issuance of a bond forfeiture and warrant for his arrest (D. 12(m) ¶ 62). On November 12 one of the Sheriff's warrant clerks entered the warrant into the SPWA, a printout of which was then sent to the Oak Park Police Department (*id.* ¶ 66). When Poloncasz later appeared in court, the judge granted his motion to vacate (*id.* ¶ 70). Unfortunately for Poloncasz, Deputy Clerk Hurt was assigned the task of preparing the recall order for the judge's signature (*id.* ¶ 71; Stevens Dep. 81)—and this time Hurt made two mistakes: she misspelled the defendant's name as "Poloncase" instead of "Poloncasz" and she listed the case number as "91 MC 4010157" instead of "91 MC 401157" (P.Ex. 14).

Once again, then, an inaccurate recall order (No. 528919) was sent into the pipeline for processing. And as with Hvorcik, when some months later Poloncasz came into contact with an Oak Park police officer on an unrelated matter, a routine LEADS[27] check erroneously reported the quashed warrant as active.

*C.  Hedge.* Events leading up to Hedge's invalid arrest are more complicated, but they need not be detailed for present purposes. Suffice it to say that the convoluted series of errors that ultimately resulted in Hedge being detained on a warrant that should have been—but was not—eliminated from the system cannot be ascribed to Sheahan's delinquencies as a matter of law.

\*    \*    \*    \*    \*    \*

It thus appears that neither of the corrective measures that might reasonably have been required of Sheahan would have prevented Hvorcik's or Poloncasz' detention—when the input of a recall order into the system contains the kinds of errors made by Deputy Clerk Hurt, no amount of cross-checking would have eliminated the warrant from the active list, nor would a direct pickup of copies of the recall order by the Sheriff's personnel have done the job. As for Hedge, the necessary drawing of reasonable inferences in Sheahan's favor precludes any finding as a matter of law that either of those corrective measures would have prevented Hedge's ultimate invalid arrest. All of that being true, each of the three named plaintiffs has failed to show the required affirmative link between (1) Sheahan's deliberate indifference to known violations of the constitutional rights of persons with warrants that had been quashed or recalled but were nonetheless retained in the system[28] and (2) the constitutional tort suffered by that plaintiff.

---

**26.** Apparently the error stemmed from the fact that June 6 was the next scheduled court date (Stevens Dep. 33–34; P.Ex. 7).

**27.** LEADS is the acronym for the Illinois State Police Law Enforcement Data System, the statewide counterpart to Cook County's SPWA.

**28.** To expand on the analysis, where the deliberate indifference takes the form of an omission—a failure to act—the proximate cause inquiry requires at a minimum that the plaintiff's injury

would not have occurred but for the defendant's failure to take the curative action. That requirement of an appropriate systemic response by Sheahan, not one that would eliminate every error and make him a guarantor of its infallibility, defeats the contention at P.R.Mem. 23 that despite Hurt's error "[a] reasonably trained employee in the FWD could have located the warrant for Jeffrey Hvorcik by using either his last name or the case number."

And that negates liability to any of the named plaintiffs on Sheahan's part.

■ As to other members of the class, however, causation presents no such difficulty. It is self-evident that the failure to wash dead warrants from the system is a substantial factor in causing the type of unlawful arrest and detention complained of in this action. And it must be remembered that once a class has been certified it acquires an existence separate and apart from that of the individual named plaintiffs, so that the failure of the latters' individual claims does not impair the class' entitlement to relief (*United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397–401, 100 S.Ct. 1202, 1209–11, 63 L.Ed.2d 479 (1980); *Sosna v. Iowa*, 419 U.S. 393, 399–403, 95 S.Ct. 553, 557–59, 42 L.Ed.2d 532 (1975)). Hence for those other class members who (unlike Hvorcik, Poloncasz and perhaps Hedge) would not have suffered arrest and detention if Sheahan had taken appropriate action rather than remaining deliberately indifferent, causation does not stand as an obstacle to awarding summary judgment in favor of the class.

*False Arrest—False Imprisonment Claim*[29]

■ Plaintiffs' second count need not detain this Court long, for much of the discussion overlaps with ground already covered. As with a similar Fourth Amendment claim, a plaintiff in a false imprisonment action must show that the restraint was either unreasonable or without probable cause (*Martel Enterprises v. City of Chicago*, 223 Ill.App.3d 1028, 1031, 164 Ill.Dec. 945, 949, 584 N.E.2d 157, 161 (1st Dist.1991); see also *Magnuson v. Cassarella*, 812 F.Supp. 824, 831 (N.D.Ill.1992), quoting *Meerbrey v. Marshall Field & Co.*, 139 Ill.2d 455, 475, 151 Ill.Dec. 560, 569, 564 N.E.2d 1222, 1231 (1990)).

In response to that state law claim, Sheahan urges that his conduct with respect to illegitimate arrests and detentions has been immunized by state law. Under the Illinois Tort Immunity Act, 745 ILCS 10/2–202:

> A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct.

*Glover v. City of Chicago*, 106 Ill.App.3d 1066, 1074–75, 62 Ill.Dec. 597, 604, 436 N.E.2d 623, 630 (1st Dist.1982) (citations omitted) defines that concept:

> Willful and wanton conduct has been defined as conduct which is intentional or committed under circumstances exhibiting a reckless disregard for the safety of others. A person is guilty of wilful and wanton conduct when he ignores known or plainly observable dangerous conditions and does something that will naturally and probably result in injury to another.

Accord, such cases as *Anderson v. Village of Forest Park*, 238 Ill.App.3d 83, 94, 179 Ill. Dec. 373, 381, 606 N.E.2d 205, 213 (1st Dist. 1992).

It is thus apparent that the required inquiry into the viability of plaintiffs' false arrest claims is essentially indistinguishable from the just-completed Section 1983 analysis. If there is a substantive difference between the constitutional content of "deliberate indifference" and the Illinois reading of "willful and wanton," it is so subtle as to defy meaningful application. Summary judgment thus appears appropriate if no reasonable jury could find that Sheahan has not acted willfully and wantonly in that sense (*Glover*, 106 Ill.App.3d at 1075, 62 Ill.Dec. at 604, 436 N.E.2d at 630).

Accordingly the conclusions stated as to plaintiffs' Section 1983 claims in the preceding section apply with equal force to their Count II state law claims. That applies to the denial of both the individual named plaintiffs' and Sheahan's summary judgment motions and to the granting of the class' like motion as to Sheahan's liability.

**29.** Plaintiffs' Third Amended Complaint alleges both wrongful arrest and incarceration, and their memorandum refers interchangeably to false arrest and false imprisonment (see *Dutton v. Roo–Mac, Inc.*, 100 Ill.App.3d 116, 119, 55 Ill.Dec. 458, 461, 426 N.E.2d 604, 607 (2d Dist.1981)) ("a person who has been falsely arrested is at the same time falsely imprisoned, and an unlawful arrest may support a cause of action for either false arrest or false imprisonment").

### Contempt of Court

■ Count III seeks to tar Sheahan with violations of the combined provisions of 55 ILCS 5/3–6019 and 55 ILCS 5/3–6020:

> Sheriffs shall serve and execute, within their respective counties, and return all warrants, process, orders and judgments of every description that may be legally directed or delivered to them.

> The disobedience of any sheriff to perform the command of any warrant, process, order or judgment legally issued to him or her, shall be deemed a contempt of the court that issued the same, and may be punished accordingly; and he or she shall be liable to the party aggrieved for all damages occasioned thereby.

As *Scott v. O'Grady*, 975 F.2d 366, 371 (7th Cir.1992) described those statutes:

> Illinois law thus specifically directs the county sheriff to enforce state court orders and punishes him if he does not.

At least two reasons compel the denial of plaintiffs' summary judgment motion on that claim. To begin with, it takes a materially stronger showing to impose liability on a sheriff under those statutes than the standards that are applicable to the previously discussed claims[30]—and it cannot be said that the applicable higher standard has been met as a matter of law. In addition, plaintiffs have not shown as a matter of law any way in which the statutory provisions have been violated.

### Sheahan's Cross–Motion

■ Sheahan has renewed his claim of absolute immunity under the Eleventh Amendment. This Court has already rejected that argument on Sheahan's earlier motion to dismiss (a slightly abbreviated version of the current contention, right down to the same case citations). Thus nothing now advanced by Sheahan changes this Court's earlier conclusion. But because the earlier ruling was oral, this opinion will canvass the relevant considerations.

Although it does not read that way literally, for over a century (*Hans v. Louisiana*, 134 U.S. 1, 1–20, 10 S.Ct. 504, 504–509, 33 L.Ed. 842 (1890)) the Eleventh Amendment has been held to prohibit any suit against an unconsenting state in a federal court by any of its own (as well as by any out-of-state) citizens. Hence this action would be barred if Sheahan, in failing to remove the quashed warrants from the SPWA, acted as an arm of the state. Analysis demonstrates that he did not.

Both sides agree (as does this Court) that the maximum guidance here is provided by the discussion in *Scott*, 975 F.2d at 370 (citation omitted), where Sheahan's predecessor as Sheriff was sued in his official capacity in connection with carrying out a state judicial order:

> Thus, if O'Grady and Branch [another defendant] were acting as agents of the State of Illinois when they forcibly evicted the Scotts, this lawsuit is a damage action against Illinois and is barred by the Eleventh Amendment. But since the Eleventh Amendment bar "does not extend to counties and similar municipal corporations," this suit can go forward if O'Grady and Branch were acting as county officials.

After noting that resolution of that question hinges at least in part on state law (*id.*, citing *Mount Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977)), *Scott* referred to Ill. Const. art. 7, § 4(c) (which specifically designates the sheriff as a county officer) and to two Illinois statutes making the county and not the state responsible for the sheriff's remuneration (formerly Ill.Rev.Stat. ch. 34, § 4–8001, now repealed (see 55 ILCS 5/4–8001)) and for offices, furniture and expenses (55 ILCS 5/5–1106). And it has long been settled (*People ex rel. Davis v. Nellis*, 249 Ill. 12, 21, 94 N.E. 165, 169 (1911)) that the sheriff is an officer of the county. But *Scott*, 975 F.2d at 371 explains that none of those things is dispositive:

> So, when a county sheriff in Illinois performs his duties as the principal executive

---

**30.** *American Fletcher Mortgage Co. v. Bass*, 688 F.2d 513, 517 (7th Cir.1982) indicates that reasonable diligence ("at the very least, ... a good faith effort") to comply with the court order would suffice to avert liability.

officer or chief law enforcement officer of the county, he acts as a county official and does not get the benefit of the Eleventh Amendment. But this conclusion does not end our inquiry. The fact that O'Grady and Branch normally act as county officials does not mean that they can *never* act as an arm of the state. O'Grady and Branch argue that they act as an arm of the state when, as in this case, they act to enforce orders issued by state courts. We agree.

Sheahan attempts to portray the present case as fitting the same mold—but to no avail. In *Scott* the state court had entered a mortgage foreclosure judgment and issued a writ ordering the sheriff to assist the transfer of the property from the present occupants. As *Scott, id.* (citation omitted) put it:

> O'Grady and Branch had a statutory, non-discretionary duty to execute this writ. Had they failed to execute the writ, O'Grady and Branch would have been in contempt of court and liable ... for damages. Under these circumstances, we agree with the district court that Sheriff O'Grady and Deputy Sheriff Branch were not acting as county officials.

But that "statutory, non-discretionary duty" to serve and execute specific court orders under penalty of contempt contrasts sharply with the discretion that the sheriff exercises over functions within his own office (*id.* at 370–71, citing *Hufford v. Rodgers*, 912 F.2d 1338, 1341 (11th Cir.1990)).

Sheahan's position that he is "just an agent of the court" can be divided into two categories. First he argues that his duties derive from *statutory* mandates, contending (as he did in support of his motion to dismiss) that "in obeying the lawful orders and directions of the court pursuant to [55 ILCS] 5/3–6019 and in serving and executing all warrants pursuant to [55 ILCS] 5/3–6023,[31] [he] acts as an arm of the state court system" (D.Mem. 4). Then D. 12(n)(2) ¶ 125 points to state *judicial* mandates such as Cook County Circuit Court Judge Gerrity's August 29, 1983

memo prescribing performance procedures for Sheriff's warrant clerks and a 1989 court order (*General Order No. 8–89*).

As for the first of those statutory provisions, it merely directs sheriffs to serve, execute and return warrants—it does not deal at all with the recordkeeping procedures as to quashed warrants. Any system that Sheahan develops for that purpose cannot be characterized as "non-discretionary" or ministerial. This case is not at all about Sheahan's serving an arrest warrant pursuant to state statute. Instead it deals with his personally developed non-dictated practices for maintaining the SPWA and tracking and purging warrants.[32]

Nor does the second statute's directive to "obey the lawful orders and directions of the court" help Sheahan. This Court's earlier ruling denying Sheahan's motion to dismiss explained why any attempted reliance on that generalized mandate proves too much (Opinion 1993 WL 192948 at *2):

> Surely the test for that purpose is not whether Sheahan acts pursuant to a state *statute*, because that necessarily describes *everything* that he does and would thus render entirely meaningless his status as a county official. Quite unlike the action implicated in *Scott*, Sheahan's activities that are the gravamen of the [complaint]—those relating to the establishment and maintenance of records as to outstanding warrants—do not represent the purely ministerial enforcement of the orders of the state judiciary (they are not the fulfillment of a "statutory, non-discretionary duty" as *Scott, id.* at 371 described what was at issue there).

Nothing in Sheahan's repetition of the same argument this time around calls for a different conclusion.

Sheahan's contentions based on Judge Gerrity's memorandum and on General Order No. 8–898 are equally unpersuasive. This Court subscribes entirely to Judge

31. [Footnote by this Court] That statute reads: Each Sheriff shall, in person or by deputy, attend upon all courts held in his or her county when in session, obey the lawful orders and directions of the court.

32. Judge Hart reached the identical conclusion in *Ruehman* at 1049.

Hart's dispatch of Sheahan's identical argument (voiced by the same lawyer) in *Ruehman* at 1049–50:

> [Judge Gerrity's] memorandum sets forth certain procedures for Sheriff's employees in the warrants office and Sheriff's employees who provide courtroom services. It is disputed whether this 1983 memorandum was in effect in 1991 when plaintiff ... was arrested on a recalled warrant. In any event, the memorandum is not an order of the court. It is clear from the memorandum that it is merely reporting the procedures that the various agencies involved have agreed to implement in light of recommendations made by the Sixth Municipal warrant study committee. This memorandum does not convert any undertaking by the Sheriff to follow these procedures into the implementation of a court order. Additionally, the memorandum still leaves to the Sheriff's discretion the actual implementation of the computer tracking system and other procedures. General Order No. 8–89, which the Sheriff also relies upon, provides that police officers are to check with the Warrant Division prior to bringing prisoners for bond hearings and that the Warrant Division will complete a form noting any outstanding warrants. The order states nothing about tracking warrants or quash and recall orders and says nothing about the computer system. General Order No. 8–89 does not in any way control or limit the Sheriff's discretion in setting up a warrant tracking system. The damages claims against the Sheriff are not barred by the Eleventh Amendment.

In short, all of Sheahan's Eleventh Amendment immunity contentions are wholly without merit.[33] In *Ruehman* Judge Hart rejected the selfsame argument no fewer than three times (see *Ruehman* at 1049, referring to his similar conclusions earlier in that lawsuit). It is about time that Sheahan gave it up.

### Conclusion

Although the Rule 56 motion on behalf of all three individual plaintiffs is denied, the corresponding motion by the plaintiff class is granted as to Sheahan's liability to any class member who has been injured by Sheahan's deliberate indifference. Sheahan's cross-motion for summary judgment is denied.

---

**33.** Sheahan's supporting memorandum adds two other arguments that are so groundless that no time will be wasted here on treating with them.