ESTATE OF Scott B. STEVENS, Baptist Stevens, and Judy Stevens, Plaintiffs–Appellants,

v.

CITY OF GREEN BAY, John Laux, Officer, and Patrick Buckley, Officer, Defendants–Appellees.

No. 96–2473.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1996.

Decided Jan. 29, 1997.

Benjamin S. Stern (argued), Chernov, Stern & Burbach, Milwaukee, WI, for Plaintiffs–Appellants.

Judith Schmidt–Lehman (argued), Timothy J. Kelley, City of Green Bay, Law Dept., Green Bay, WI, for Defendants–Appellees.

Before BAUER, RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

Scott Stevens, a resident of the Oneida Indian Reservation near Green Bay, Wiscon-

sin, was involved in a fight in a Green Bay night club which the police quelled. The police took Stevens to a public telephone to call a cab. Ninety minutes later, in the early morning of October 28, 1993, a car struck and killed Stevens while he walked in the middle of a street in Green Bay. His blood alcohol level at the time of his death was .237 grams of alcohol for every 100 milliliters of blood.

While the Due Process Clause of the Fourteenth Amendment imposes no duty upon a state to provide the general public with protective services, the Supreme Court has stated that such a duty may arise out of a "special relationship" created or assumed by the state with respect to certain individuals. Stevens' estate sued the city and its police claiming that the police officers who quieted the disturbance at the bar created such a "special relationship" by taking Stevens into custody and by abandoning him under circumstances which rendered him vulnerable to dangers created by the officers' actions. The magistrate judge disagreed, and under the doctrine of qualified immunity recommended granting the defendants summary judgment. The district court followed the magistrate judge's recommendation. Stevens' estate appeals the grant of summary judgment on the substantive due process claim. We affirm.

## I.

We examine this case's facts in some detail and from the perspective of Stevens' estate, which we take on this appeal from an adverse grant of summary judgment.

On October 27, 1993, Scott Stevens, Jason King, and Jeremy King drank several beers at Jason King's home before eventually meeting a group of their friends at Julie King's home around 10:30 p.m. When Stevens arrived at Julie King's home, she judged him to be "pretty well drunk." She stated that Stevens was not allowed to drink at her house because "he was already too drunk." The group left at approximately 11:00 p.m. and moved the party to the "Col-

ors" nightclub in Green Bay. (Stevens did not drive; he rode in someone else's car.)

While at Colors, Stevens argued with his former girlfriend, Michelle Powless, notwithstanding a restraining order Powless had against Stevens outlawing any contact between them. Also at Colors that night were several Green Bay Packer football players. Shawn Collins was standing at the bar in a discussion with a number of teammates, including James Willis, Wayne Simmons, and Robert Brooks. Willis may have been speaking with Powless. Stevens allegedly tried to push himself into the middle of the players' conversation, mumbled what may have been curses, and then took a swing at Collins, punching him in the jaw. (Later Collins said that Stevens may have mistaken him for Willis.) Collins had a half-empty beer bottle in his hand and struck back, cutting Stevens on the left ear. The cut began to bleed. Bouncers immediately intervened and took the combatants outside into the parking lot.

Outside, the club's assistant manager flagged down a Green Bay police car driven by Officer John Laux. Officer Patrick Buckley also was dispatched to the disturbance. A bouncer told Officer Laux that Stevens was shouting racial slurs against several black patrons and had punched one of them while in the bar. Officer Laux then spoke with Stevens who, according to Officer Laux, "indicated to me that he didn't start anything and that the niggers have no business hanging around the bar." Officer Laux asked Stevens and Collins if they wished to press charges against each other. They declined. According to Officer Laux, Stevens appeared to have been drinking, but did not appear incapacitated. Stevens spoke rationally, seemed to comprehend his surroundings, was alert and conscious, and did not stagger when he walked. Officer Buckley observed that Stevens was bleeding from his left ear, and gave him a gauze pad which Stevens placed on the cut. Twice Stevens declined further medical attention, including an offer to call a rescue squad. Stevens asked a couple of times whether he could leave. According to Officer Buckley, after Stevens' index [1] came back he was told he could go.

---

1. We assume this refers to a computer check of

Stevens' name and description which officers

Because nightclub employees told Officer Laux that Stevens was no longer welcome in the bar, Laux told Stevens not to return.

When Officers Laux and Buckley spoke with Stevens in the parking lot, Powless stood by. She expressed concern to one of the officers about Stevens' cut. Later she remembered the officer commenting that Stevens "would be alright," and she thought the officer told her that Stevens would not be arrested and that he would make sure Stevens "gets to the hospital or gets home."

During their conversation Stevens asked Officer Laux for a ride home. When Stevens said he lived on the Oneida Indian Reservation outside Green Bay, Officer Laux told him that he could not drive him outside the city limits. Instead, Officer Laux offered to call Stevens a taxi cab. But Stevens did not want to pay for a cab to take him home. Stevens told Officer Laux that friends in the bar would give him a ride home.

Here the participants' stories diverge. Stevens' companions that night tell one version. Jason King said "the cops wouldn't let me talk to [Stevens], they just told me to go back into the bar." He also said the police officers "never asked if we would give [Stevens] a ride home then they left." Nicole Lasilla, another friend, stated that when she attempted to go outside to talk to Stevens, she was prevented from leaving the bar to do so. She does not recall the police asking any of Stevens' friends to take him home. Julie King stated "[w]e tried to go outside by him and they [the bouncers] told everyone who tried to go out there to go back in the building." Julie said that at one point the police officers entered the bar and told her that "Scott was going to wait in the car, that he was outside. . . . [T]hey asked if we were gonna bring him home, and we said yes, and they told us he would be outside waiting for us." When Ms. King left the club 45 minutes later, Stevens was gone.

The police officers' version differs. They said they entered the nightclub and spoke with two men who had been identified as Stevens' friends. According to Officer Laux, "the bouncer showed me who Scott had come

with and both male Indians declined to give him a ride." Officer Buckley confirms Officer Laux's recollection of these particular events. In Officer Buckley's report he said Officer Laux told Stevens' friends "what happened and told them that Stevens was walking in case one of them wanted to give him a ride." Officer Laux referred to Stevens once in his report of the incident as a "suspect."

After the police left the nightclub, Officer Laux informed Stevens that his friends refused to take him home, and that Stevens must leave. As the officers left the parking lot Stevens appeared to be walking toward the nightclub's entrance. Officer Laux stopped Stevens and offered to give him a ride to Grand Central Station, a gas and convenience store located a short distance from the nightclub so that Stevens could use the pay phone to arrange for a ride home. Stevens accepted Officer Laux's offer. Before he allowed Stevens to ride in the patrol car, Officer Laux patted him down and found no weapons. Officer Laux then manually disengaged the child-protective mechanism in the back doors of the squad car which prevents egress. He did not handcuff Stevens or give him *Miranda* warnings. Stevens entered the patrol car and rode in the rear passenger seat. Officer Laux drove out of the Colors parking lot, down a frontage road, and then dropped Stevens off at the Grand Central service station parking lot 1/2 block from the nightclub. This station had three public telephones: two in the parking lot where Officer Laux dropped Stevens off, and one in the station's vestibule. Officer Laux reiterated to Stevens as he got out of the car that he was not wanted at Colors, and Stevens agreed. Stevens left the squad car on his own, and thanked Officer Laux, who resumed his patrol. This took place around 12:45 a.m.

Sometime after Stevens was dropped off at Grand Central Station he was reportedly seen at the apartment of a former girlfriend, Jessica Brooks, which is located behind that service station. Stevens lived about 10 miles away. Ninety minutes later, at approximately 2:15 a.m., Stevens was walking in the westbound lane of Mason Street, approxi-

would use to determine if any arrest warrants were outstanding against Stevens.

mately 1 1/2 miles from the service station, and was struck from behind by a car driven by Jason Charles. The impact threw Stevens' body onto the hood of Charles' car and the back of his head struck the windshield before he rolled off the car. The collision fractured Stevens' lower limbs and he sustained massive skull and neck fractures. Stevens died as a result of the injuries. .

Stevens' estate and his parents (hereinafter referred to as "the estate" or "Stevens' estate") sued the City of Green Bay and Officers Laux and Buckley alleging that their actions violated Stevens' civil rights and that as a result of these violations Stevens was struck and killed. Stevens' estate sued under 42 U.S.C. §§ 1983 & 1988 and directly upon the Fourteenth Amendment.[2] After analyzing the plaintiffs' claim in a lengthy order and recommendation, the magistrate judge granted the summary judgment motion of the city and its police officers. The magistrate judge concluded that the doctrine of qualified immunity precluded the estate's substantive due process claim because Stevens' constitutional rights were not violated. He also concluded that a reasonable jury could not return a verdict for the plaintiffs on its equal protection claim that the officers' actions were motivated by discriminatory intent against Indians. Because no federal claims remained, the magistrate judge declined to exercise supplemental jurisdiction over the estate's state law claims. The district court adopted the magistrate's recommendation in total.

Stevens' estate appeals only the district court's grant of summary judgment to the police officers on the substantive due process claim because they had qualified immunity. The estate contends the district court erred in its analysis of the facts as to whether Stevens was in custody, and whether the officers placed him in a position more vulnerable to danger. The estate argues that summary judgment is inappropriate and that the substantive due process claim should be resolved at trial.

The district court had jurisdiction in this case pursuant to 28 U.S.C. §§ 1331 & 1343(a)(3) and (4), and this court has jurisdiction pursuant to 28 U.S.C. § 1291. The familiar *de novo* review of summary judgment granted under Fed.R.Civ.P. 56 applies here. We examine the record and all reasonable inferences drawn therefrom in a light most favorable to Stevens' estate, the non-movant. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## II.

"Qualified immunity is a legal issue, but it is one which, because of the particularity requirement, is bound up in the facts of a particular case." *Hall v. Ryan,* 957 F.2d 402, 404 (7th Cir.1992) (citing *Rakovich v. Wade,* 850 F.2d 1180, 1202 (7th Cir.1988) (*en banc*)). "[T]he defense of qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.' " *Eversole v. Steele,* 59 F.3d 710, 717 (7th Cir.1995) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). When defen-

**2.** Plaintiffs also sued Collins, the car's driver, the nightclub, and an insurer for various state law claims.

dants raise the defense of qualified immunity, as the Green Bay police officers have, this court engages in a two-part, objective inquiry: (1) whether the plaintiff has asserted a violation of a federal constitutional right, and (2) whether the constitutional standards implicated were clearly established at the time in question. *Id.* (citing *Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994)). Once a defendant has pleaded qualified immunity, the plaintiff has the burden to demonstrate the existence of the clearly established constitutional right. *Abel v. Miller,* 824 F.2d 1522, 1534 (7th Cir.1987). "The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Stevens' estate argues that Stevens had a constitutional right to protective services which the police officers denied him. The estate centers its argument on *DeShaney v. Winnebago Cty. Dep't of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* the Supreme Court rejected the argument that the Due Process Clause of the Fourteenth Amendment requires a state to protect the life, liberty, and property of its citizens against invasion by private actors. "The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimum levels of safety and security.... [I]ts language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* at 195, 109 S.Ct. at 1003. The Court recognized that the Due Process Clause generally confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196, 109 S.Ct. at 1003. "If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id.* at 196–97, 109 S.Ct. at 1003–04.

The petitioners in *DeShaney* contended that even if the Due Process Clause imposes no affirmative obligation on the state to provide the general public with adequate protective services, such a duty may arise out of certain "special relationships" created or assumed by the state with respect to certain individuals. *Id.* at 197, 109 S.Ct. at 1004. The petitioners asserted that in undertaking to protect Joshua DeShaney from danger of abuse by his father, the state acquired an affirmative duty enforceable through the Due Process Clause to do so in a reasonably competent fashion, and that the state's failure to discharge that duty so shocked the conscience that it constituted a substantive due process violation. *Id.* The Supreme Court rejected petitioners' argument that the federal Constitution could be so interpreted. In doing so, the Court stated: "It is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198, 109 S.Ct. at 1004. It reviewed two areas where a "special relationship" may be created, imposing a due process duty to protect: (1) custodial settings in which the state has limited the individual's ability to care for himself, and (2) when the state affirmatively places the individual in a position of danger the individual would not have otherwise faced. *Id.* at 199–202, 109 S.Ct. at 1005–07.

Stevens' estate submits that genuine issues of material fact exist as to: (a) whether Stevens was in custody, and (b) whether the police officers placed Stevens in a position more vulnerable to danger than would have confronted him had the officers not acted at all. We consider each argument in turn.

### A. "In Custody"

In describing the "in custody" special relationship in *DeShaney,* 489 U.S. at 199–200, 109 S.Ct. at 1005–06, the Supreme Court cited incarceration and institutionalization cases as examples of the "deprivation of liberty" triggering substantive due process protections: *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976) (state required to provide adequate medical care to incarcerated prisoners), and

*Youngberg v. Romeo,* 457 U.S. 307, 314–25, 102 S.Ct. 2452, 2457–63, 73 L.Ed.2d 28 (1982) (state required to provide involuntarily committed mental patients with such services as are necessary to ensure their reasonable safety from themselves and others). Beyond these decisions, the Court did not elaborate as to the particularities of the "in custody" requirement before substantive due process protection attaches.

In this case, the district court, magistrate judge, and the estate assumed, without citation to authority, that Fourth Amendment criminal case law correctly elucidates the phrase "in custody." Given the authority expressly relied upon by the Supreme Court when it recognized this constitutional duty, we are not at all sure this is correct. The Supreme Court's express rationale in *DeShaney* for recognizing a constitutional duty does not match the circumstances of a simple criminal arrest: "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1005 (citing *Estelle,* 429 U.S. at 103–04, 97 S.Ct. at 290–91; *Youngberg,* 457 U.S. at 315–16, 102 S.Ct. at 2457–58). This rationale on its face requires more than a person riding in the back seat of an unlocked police car for a few minutes. Despite the absence of authority supporting such a broad view of "in custody," we will look to this area of law for the single purpose of considering the estate's argument.

■■■■ To determine whether someone was "in custody" under the Fourth Amendment, a court examines the objective circumstances of the situation using the perspective of a reasonable person in the suspect's position. *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293 (1994) (per curiam); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (person in custody "if, in view of all the circumstances surrounding the incident, a reasonable person

would have believed that he was not free to leave."). We are to consider the totality of the circumstances involved when making this determination. *See California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam).

The magistrate judge and district court concluded that Stevens was not in the custody of Officers Laux and Buckley. The magistrate judge characterized "what transpired between Stevens and the officers [ ]as a police-citizen encounter that never rose to the level of a custodial situation." Any belief by Stevens that he could not leave would have been unreasonable considering that Stevens accepted Officer Laux's offer to take him to the service station, the magistrate judge decided. The district court reached the same conclusion based on the following facts: Stevens knew Collins did not wish to press charges against him; Officer Laux offered to arrange a cab ride home for Stevens and Stevens was under no obligation to accept the officer's offer of a ride to the gas station; Stevens was not handcuffed nor read *Miranda* warnings; and upon arriving at the gas station Stevens left the squad car voluntarily and thanked Officer Laux for the ride.

On appeal, Stevens' estate disputes that a reasonable person would have concluded he was free to leave the Colors parking lot. The estate points to the following facts or inferences it believes the district court ignored: the officers informed Stevens he was going either home or to a hospital; they prohibited him from reentering Colors to get assistance from his friends; they prohibited Stevens' friends from assisting him; they threatened to arrest Stevens if he did not cooperate; they patted Stevens down and "physically placed him in Laux's patrol car"; and they "took Stevens away from the bar after he violated their order not to reenter Colors."

The estate relies upon these inferences to tilt the totality of circumstances its way. But many are not reasonable. The officers informed Stevens' former girlfriend, not Stevens, that he was going either home or to a hospital. Although the officers prohibited Stevens from reentering Colors, it is reasonable to conclude they did so to keep the

peace and pursuant to the management's wishes.[3] The same is true with regard to any threat to arrest Stevens if he attempted to reenter Colors. Further, rather than "physically place [Stevens] in Laux's patrol car," Officer Laux offered—and Stevens accepted—a ride *before* Stevens entered the car. Given Stevens' acceptance of Laux's offer, the effect of Stevens being driven a short distance away from Colors does not directly follow from the cause of his "violating the officers' order not to reenter Colors," as the estate asserted in its brief and at oral argument.

■ The undisputed facts show Stevens knew or should have known that he was not in custody in either the Colors' parking lot or when he was driven to the service station. Officer Laux told Stevens he was free to leave. From the beginning of this encounter, Stevens knew that Collins did not wish to press charges against him for the tavern fight; neither of the officers indicated to Stevens that he was under arrest for probable cause that he had committed a crime. Stevens was not handcuffed. The officers did not give him *Miranda* warnings. The child-safety lock on the rear passenger compartment of the squad car which would have prevented him from exiting was disengaged. Upon arriving at the gas station, Stevens left the squad car voluntarily and thanked Officer Laux for the ride. The only objective facts or inferences pointing to a custodial relationship were that Stevens was patted down, and he was given a ride in a police squad car. But the first is for the officers' safety, and every police escort is not custodial. *The Estate of Konerak Sinthasomphone v. City of Milwaukee*, 838 F.Supp. 1320, 1327 (E.D.Wis. 1993). At oral argument, the estate's counsel agreed with a panel member's hypothetical statement that if police officers offer an individual a ride, put him in the back seat of a patrol car, and drive that person to a nearby gas station, the individual was "in custody." The case law does not support such a statement. *See id.* ("Not every person the police usher from one place to another is in custody

or a special relationship with them."); *see also Losinski v. County of Trempealeau*, 946 F.2d 544, 550 (7th Cir.1991) (refusal to extend *DeShaney* to circumstances involving protective escort by sheriff's deputy).

We agree with the magistrate judge and the district court that a reasonable person in Stevens' position, given the objective circumstances in the Colors parking lot that evening, would consider himself free to leave, and that Stevens was not "in custody" during the ride to the Grand Central service station.

### B. A Position Of Danger

■ The second "special relationship" possibly implicating the protections of the Due Process Clause under *DeShaney* is where the state creates a dangerous situation or renders citizens more vulnerable to danger. *See Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.) ("*DeShaney*, however, leaves the door open for liability in [such] situations . . . .") (citing *DeShaney*, 489 U.S. at 201, 109 S.Ct. at 1006), *cert. denied*, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993).

The magistrate judge and district court concluded that the officers placed Stevens in no worse position than if they had not acted at all. Stevens' estate had argued that the officers placed Stevens in danger by not letting his friends take him home. Considering the conflicting testimony from Stevens' friends, the trial court accepted Stevens' assertions that his friends were available to drive him home. Even given that, both the magistrate judge and the district court found that the police officers had provided meaningful alternative sources of aid.

The estate asserts that the district court focused on the wrong facts. It points to numerous inferences it would draw from the facts which it believes the district court overlooked. It argues vociferously that the district court ignored Stevens' high blood alcohol level in the medical examiner's report, from which it should be concluded that Stevens' judgment, coordination, and perception were so impaired at the time of the encounter that he was incapacitated. The estate

---

**3.** Whether the officers prohibited Stevens' friends from assisting him is treated *infra* at pp. 1177–78.

submits that an offer to a judgment-impaired person to make his own travel arrangements home is not a reasonable alternative to allowing that person to ride home with friends. The estate argues that once the officers "took over Stevens' freedom to act," reasonable alternatives existed—transport Stevens to a hospital, a detox center, his residence, the city jail, or even hand him over to the tribal police—other than dropping him off at a gas station. For Stevens' estate, the deprivation of due process rights occurred when the officers took Stevens into custody but then "abandoned" him: if Officers "Laux and Buckley had not exercised control over the scene, restrained Stevens' and his friends' freedom to act, physically removed Stevens and then left him alone, Stevens would not have ended up staggering down a dark and curving highway to be struck from behind by a car in the early morning hours of October 28, 1993."

"But-for" causation cannot be laid on the shoulders of the police officers in this manner. Various other factors contributed to this tragedy, primarily Stevens' intoxication. The estate's argument that Stevens' drunken state necessarily renders the officers' actions unreasonable is a red herring. The officers did not test Stevens' blood alcohol content in the Colors parking lot. The medical examiner's report, the only fact in the record on this point, said that Stevens tested at .237g/100ml at the time of his death. Because little is known about Stevens' exact whereabouts and actions during the 90 minutes between when the officers dropped him off and he was killed, including whether he drank more during that interval, possibly at Jessica Brooks' apartment, we do not know if he was more or less intoxicated at his death than at the time of his encounter with the police. Giving Stevens' estate the benefit of the doubt on this argument, it means only that it was reasonable to conclude that Stevens was legally drunk in the Colors parking lot. Any other facts come from eyewitness testimony. Neither his friends nor the officers said Stevens was incapacitated.

■ To recover under this theory, the estate must demonstrate that the state greatly increased the danger to Stevens while constricting access to self-help; it must cut off all avenues of aid without providing a reasonable alternative. Only then may a constitutional injury have occurred. *See Ross v. United States,* 910 F.2d 1422, 1431 (7th Cir.1990) (quoting *Archie v. City of Racine,* 847 F.2d 1211, 1223 (7th Cir.1988) (en banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989)).

As the magistrate judge and district court concluded, the facts are in dispute as to whether any of his friends were ready, willing, and able to take Stevens home. The versions offered by the friends and the officers are irreconcilable. Julie King said she was told to stay in the bar, and that Stevens would be waiting in a car when they left the bar. Jason King said he was told to stay in the bar and that the matter would be taken care of. Michelle Powless said an officer told her Stevens would be taken to his "home or the hospital." Nicole Lasilla also said she was told to stay in the bar. The officers said that in their trip inside the nightclub they spoke only with male acquaintances of Stevens who declined to give him a ride. Given these contradictory versions of these few key minutes, we must, as did the magistrate and district court, adopt the estate's version that the police officers prevented Stevens' friends from taking him home. The officers' argument that Stevens' friends did not actively seek to give Stevens a ride, were content to permit him to remain in the squad car, and thus that they were not a private source of aid must be rejected.

■ Assuming the estate is correct that Officers Laux and Buckley prevented Stevens' friends from driving him home, the question is whether having precluded one reasonable alternative, the officers gave Stevens another. *Archie,* 847 F.2d at 1223. The officers twice offered Stevens medical assistance, which he refused. The officers offered to arrange a cab ride for Stevens, which he also refused. The third offer from Officer Laux—a ride to a nearby service station to use a telephone to arrange for a ride home—Stevens accepted. These options were not unreasonable. To conclude to the contrary would mean that only a ride home from friends could defuse a potentially con-

frontational situation involving an intoxicated patron such as existed at Colors; any police-initiated solutions would be inherently unreasonable. We easily reject this idea. Unlike the county sheriff in *Ross* who stood by awaiting "official" rescuers while a boy drowned, 910 F.2d at 1424–25, Officers Laux and Buckley listed for Stevens his choices for leaving, each reasonable, and allowed him to choose. He voluntarily accepted one alternative.

The estate offers another version of this liability theory. It argues that by "abandoning" an intoxicated Stevens at the Grand Central service station, the police officers rendered him more vulnerable to danger and are thus liable under *DeShaney*. The officers had no involvement in Stevens' intoxication or car accident. The extent of their interaction with him was to give him a gauze pad for his bleeding ear and a ride away from the site of a fight to a place where he could arrange for a ride home. Viewing the record from the estate's perspective, the officers rendered Stevens beneficial treatment rather than making him more vulnerable to harm. This case is not like *White v. Rochford*, 592 F.2d 381 (7th Cir.1979), a pre-*DeShaney* case relied upon by the estate, in which Chicago police officers abandoned three children at night in a car on the Chicago Skyway after arresting the automobile's driver. The children left the car, crossed eight lanes of freeway traffic, and wandered around the expressway looking for a telephone. In *White*, we found the officer's conduct shocking and violative of the children's constitutional rights. Here, unlike in *White* in which children were left in manifest danger, the officers dropped Stevens off at a place probably safer than where he had been. Grand Central Station is merely 1/2 block from Colors on the same street. Regardless, the accident occurred 1 1/2 miles from where Officer Laux dropped Stevens off.

This case is similar to *Sellers By and Through Sellers v. Baer*, 28 F.3d 895 (8th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 739, 130 L.Ed.2d 641 (1995). Larry Deuser was intoxicated and harassing women at a state fair. National park rangers and officers transported him ten blocks away from the fairgrounds and dropped him off in a parking lot located behind the nearest police station, and asked him before they released him to promise he would not return to the fair. Ninety minutes later, Deuser was struck and killed by a motorist on an interstate highway approximately 1 1/2 miles from the police station where he had been dropped off. The Eighth Circuit rejected Deuser's relatives' substantive due process claim that the rangers placed him in a dangerous situation he would not have otherwise faced, and granted the officers qualified immunity. *Id.* at 900.

In short, no "special relationship" was created between Stevens and the officers. This case does not fall within the narrow substantive due process protections recognized in *DeShaney*. Having determined that the police officers did not violate Stevens' constitutional rights, we need not reach the second step of the qualified immunity inquiry, whether the constitutional standards violated were clearly established at the time in question. *See Marshall v. Allen*, 984 F.2d 787, 793 (7th Cir.1993) ("If a plaintiff's allegations, even when accepted as true, do not state a cognizable violation of constitutional rights, then the plaintiff's claim fails.... Courts are not required to examine the clearly established law at the time of the offense if the plaintiff's allegations do not assert a violation of constitutional rights.").

### III.

An innocent police-citizen encounter culminated in a 1/2 block ride to a telephone. Tragically, Scott Stevens did not make it home that evening after the police dropped him off at the gas station. But the Constitution does not place responsibility for Stevens' death on the police officers who gave him a ride 90 minutes earlier. Both the magistrate judge and the district court correctly analyzed the plaintiffs' claims. The grant of summary judgment to the defendants is

AFFIRMED.