Joseph J. **REGALADO**, etc., **Plaintiff,**

v.

**CITY OF CHICAGO, et al., Defendants.**

No. 96 C 3634.

United States District Court,
N.D. Illinois,
Eastern Division.

April 2, 1999.

Jon Loevy and Blake Horwitz, Chicago, IL, for plaintiff.

Brian Crowe, George Yamin and Robert Barber of City of Chicago Corporation Counsel, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Joseph Regalado, suing by his guardian and father Baltazar Regalado,[1] has

---

1. To avoid the need for constant repetition of their first names, this opinion will use "Rega- lado" as a shorthand term to refer to both

brought (1) claims of excessive force and of failure to provide medical care, both advanced under 42 U.S.C. § 1983 ("Section 1983"), against City of Chicago ("City") police officers (collectively "Officers") Manuel Acevedo ("Acevedo") and Jose Garcia ("Garcia"), along with (2) state law claims of assault and battery and failure to provide medical care against Officers and related derivative claims against City itself. All defendants now move for summary judgment under Fed.R.Civ.P. ("Rule") 56.

Both sides have complied with this District Court's General Rule ("GR") 12(M) and 12(N),[2] and the motion is fully briefed and ripe for decision. For the reasons set forth in this memorandum opinion and order, defendants' motion is granted in one respect but is denied in principal part.

## Summary Judgment Principles

Under familiar Rule 56 principles defendants have the burden of establishing both the lack of a genuine issue of material fact and that they are entitled to a judgment as a matter of law (*Celotex v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Summary judgment is appropriate only if the record reveals that no reasonable jury could conclude that defendants violated Regalado's constitutional and state law rights. For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)).

What follows in the *Facts* section (and to some extent later) is culled from the par-

ties' submissions, with any differences between them resolved in Regalado's favor.[3] Other relevant facts, which fit somewhat better into the substantive legal discussion, will be set out later in this opinion.

## Facts

On June 20, 1991 Regalado, for whom there was an outstanding arrest warrant, encountered Officers Garcia and Acevedo and began to run from them (R.Mem. 1). Garcia chased Regalado down the street and out of the sight of any witnesses (R. 12(N) ¶ 5). They were thus totally out of sight for somewhere between 3 and 10 minutes (*id.* ¶ 7), but several witnesses viewed other portions of their altercation.

Passerby Richard Torres saw Regalado running from Garcia. Then he saw Garcia swing a dark object in a downward motion at Regalado's head and back. Regalado staggered and fell, and Garcia continued to hit him. Then Garcia put his knee in Regalado's upper back and neck area, picked up his head and hit him with an open palm to the face (*id.* ¶ 15). Another witness, Regalado's friend Frank Mondragon, saw Garcia push Regalado against a building and then strike him several times with a flashlight (*id.* ¶ 23). Regalado collapsed, but Garcia picked him up and again hit him on the head with the flashlight. When Regalado fell to the ground after that blow, he did not get up or move again (*id.* ¶ 24).

Several of Regalado's friends arrived on the scene after the beating. Garcia instructed them to get a hose and wet down Regalado to wake him up. That, and other efforts such as squeezing Regalado's

---

Joseph and Baltazar. Because Baltazar serves only in a representative capacity here, in every instance the context will clarify which of them is meant.

**2.** To facilitate the identification of any material factual disputes, or to demonstrate the absence of any such disputes, this District Court has adopted its GR 12(M) and 12(N). Those Rules require the parties to set out their respective factual positions together with record references.

**3.** Because nonmovant Regalado's version of the facts must be taken as true at this point, this opinion need not use hedging phrases such as "Regalado contends" or "Regalado asserts" when setting out the factual background. Moreover, this opinion will not always identify the frequent disparities in the parties' respective versions of the facts.

testicles, were unsuccessful in rousing him from his unconscious state (*id.* ¶¶ 25, 34).

Instead of calling an ambulance, or indeed even taking Regalado to the station house, Officers left him with his friends (*id.* ¶¶ 37–39). Regalado's friends carried him to the Mondragon house, and eventually everyone passed out or went to sleep (*id.* ¶¶ 41–42). When Ignacio Mondragon came home from his graveyard shift in the morning, everyone realized that something was seriously wrong with Regalado. He still could not be awakened, and spit and blood were coming from his nose and mouth (*id.* ¶ 43). His friends then called an ambulance and Regalado was taken to the hospital (*id.* ¶ 44).

According to Regalado's expert witness Dr. Robert Ehle, Regalado suffered a stroke caused by trauma to one or both of Regalado's vertebral arteries (*id.* ¶¶ 54–56). Regalado presently has a "locked in" syndrome: He has no control over his body (i.e., his arms, legs, tongue or vocal cords), but he is conscious and aware of his surroundings and is able to move his eyes up or down (*id.* ¶ 70).

### Regalado's Claims Against Acevedo

Regalado brought a Section 1983 excessive force claim (Count I)[4] and a state assault and battery claim (Count II) against Acevedo, both based on his asserted failure to prevent Garcia from using excessive force. Acevedo moves for summary judgment on both claims.

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972) is the seminal decision establishing a plaintiff's ability to bring a Section 1983 claim based on an officer's failure to intervene in another officer's use of excessive force. Such claims are now often referred to as "*Byrd* claims." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.1994) (emphasis in original) has further explained the requirements of *Byrd* claims:

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

To succeed on the current motion, then, Regalado must at least create reasonable inferences[5] that Acevedo (1) had reason to know Garcia was using excessive force and (2) had a realistic opportunity to intervene to prevent the consequent harm from occurring.

■ D.Mem. 3 n. 1 accepts as true, for purposes of this motion, Regalado's claim that Garcia did employ excessive force against him. But because it is undisputed that at least for some period of time Acevedo was not present during the altercation between Garcia and Regalado, what is at issue is whether Acevedo arrived in time to see and to prevent Garcia's use of that excessive force.

According to Jessie Mondragon ("Mondragon," not to be confused with Frank or Ignacio Mondragon referred to in the earlier factual summary), when Garcia began to chase Regalado, Acevedo told Mondragon to get into the back of the police car (R. 12(N) ¶ 26). They drove to where Regalado and Garcia had stopped, and Mondragon could see from the back seat

---

4. To be more precise, of course the constitutional claim is one of unlawful seizure in violation of the Fourth Amendment as incorporated by the Fourteenth Amendment.

5. In this summary judgment context Regalado's burden is only that of creating reasonable inferences, not one of proof as such. But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the case law speaks of what a plaintiff must "prove" or "show." Accordingly, whenever this opinion employs such terms it should be understood as meaning Regalado's lesser burden of creating reasonable inferences, not his actually bearing the burden of persuasion. That inference-creating burden is the test that this Court has in fact used throughout this opinion.

that Regalado was handcuffed and in a standing position (*id.* ¶ 27). Mondragon then asked Acevedo to let him out of the car so that he could see what was happening between Regalado and Garcia, but Acevedo refused and got out of the vehicle himself (*id.* ¶ 28). Mondragon then asked his two friends, who were outside of the car, to let him out. By the time his friends opened the door and Mondragon next saw Regalado, he was face down on the ground and Garcia had his knee on the back of Regalado's neck (Mondragon Dep. 48–49). Garcia kept his knee on Regalado's neck for about 5 minutes (*id.* 87).[6]

As already stated, other witnesses testified that at some point Garcia struck Regalado with a flashlight several times, causing him to fall to the ground, unable to move or stand up again (R. 12(N) ¶¶ 15, 23–24). When combined with Mondragon's testimony that Regalado was standing when he and Acevedo arrived on the scene, a jury could also reasonably infer that Acevedo witnessed and had an opportunity to prevent the blows that forced Regalado to the ground.

*Yang,* 37 F.3d at 285 has made clear that a realistic opportunity to intervene need not involve any extended time frame:

> At a minimum Officer Hardin could have called for a backup, called for help, or at least cautioned Officer Brown to stop. In fact, Officer Hardin should have arrested Officer Brown.

See also the like statement in *Thorner v. City of Harvey,* 1998 WL 355526, at *11 (N.D.Ill. June 24,1998):

> [T]his court finds that a reasonable jury could find that a nonparticipatory officer who had more than a "split-second" to react to excessive force but "less than a minute" could have acted to prevent the harm, at least by telling the malfeasant officer to stop.

And as *Lanigan v. Village of E. Hazel Crest,* 110 F.3d 467, 478 (7th Cir.1997) has reconfirmed:

> Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

Hence genuine issues of material fact exist as to whether Acevedo did in fact know of Garcia's use of excessive force and had an opportunity to intervene. Acevedo's motion as to Regalado's Section 1983 claim is therefore denied.

■ Regalado's state law claim can be dealt with quickly, for his response did not even address Acevedo's arguments as to that claim. D.Mem. 6 n. 2 contends that Acevedo is entitled to summary judgment on Regalado's state law claim of assault and battery because there is no *Byrd* equivalent under Illinois law. Moreover, Acevedo argues, even if such a claim were recognized he would be immune from liability pursuant to the Illinois Local Governmental and Governmental Employees Tort Immunity Act (the "Act," 745 ILCS 10/1–101 to 10/10–101).[7] In that respect Acevedo points to Act § 2–204, which provides that "a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person" (see *Williams v. City of Harvey,* 1994 WL 186793, at *3 (N.D.Ill. May 11,1994); *Eiland v. Hardesty,* 564 F.Supp. 930, 934 (N.D.Ill.1982)).

That argument really begs the question, for a *Byrd*-type claim does not rest on any notion of vicarious liability (either respondeat superior or otherwise), which is the focus of Act § 2–204 immunity. Instead

---

6. Arguably (although Regalado did not make this argument in his memorandum) Garcia used excessive force just by pinning Regalado's neck to the ground for 5 minutes with his knee. Because Mondragon witnessed that action, a jury could reasonably infer that Aceve-

do also witnessed it and could have called out to Garcia to stop.

7. All references to the Act will take the form "Act § __," omitting the "745 ILCS 10/" portion of the official citations.

the delict is that of the nonintervening officer himself or herself, with liability flowing from the familiar concept that there may be more than one proximate cause of an injury, with the tortfeasors being jointly and severally liable. What spares Acevedo is the different principle that federal courts should be loath to launch into wholly uncharted state law seas (see, e.g., *Gust K. Newberg Const. Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987) and cases cited there).[8] And absent any assistance from Regalado, this Court will not do so here.

It is true that *Varvaris v. Delia*, 1996 WL 521287, at *4 (N.D.Ill. Sept.11,1996) has, without any substantive discussion, denied a motion to dismiss on claimed immunity grounds a state law claim against police officers who had failed to intervene in the beating of a suspect, where the complaint alleged that the failure was willful and wanton. But this Court need not decide whether to join its District Court colleague in recognizing such a claim that the Illinois state courts have not yet found viable (it is a truism that Illinois law is what the Illinois courts say it is, not what federal courts may decide it to be). After all, neither Regalado's Complaint nor his Rule 56 response alleges that Acevedo's failure to intervene, unlike his later failure to provide medical care, was willful or wanton. And Act § 2–202 creates an exception to the immunity otherwise conferred by Act § 2–204, so that *Varvaris* would not serve to support the claim against Acevedo even if this Court were inclined to be equally venturesome.

For more than one reason, then, Acevedo's motion for summary judgment as to Count II is granted. That claim is dismissed with prejudice.

### Section 1983 Denial–of–Medical–Care Claim

Officers argue that they are entitled to summary judgment on Regalado's Section 1983 denial-of-medical-care claim (Count IV) because (1) Regalado had no substantive due process right to such care, (2) even if he had such a right, Officers' actions were not sufficiently culpable and (3) Officers are entitled to qualified immunity. Because Officers' argument fails on all three points, their summary judgment motion as to that claim must be and is denied.

■■■ Ordinarily such claims of failure to provide medical care are not recognized because governmental entities and their personnel "generally [have] no affirmative constitutional duty to provide medical services to … citizens" (*Brownell v. Figel*, 950 F.2d 1285, 1289 n. 4 (7th Cir.1991)). But two exceptions exist to that general rule: (1) where plaintiff was in government custody at the time he or she was deprived of medical attention and (2) where the state itself created the danger (*Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir.1997), citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199–202, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). Because Regalado's situation so clearly falls within the state-created-danger exception, this opinion need not address whether he also qualifies for the in-custody exception.[9]

8. Although most of the cases to that effect have been diversity actions, the same reasoning applies to a state law supplemental jurisdiction claim brought under 28 U.S.C. § 1367(a).

9. In the latter respect, however, it must be said that defense counsel exhibit what seems to be a highly insensitive sense of irony in urging, as part of their in-custody analysis, that Regalado "was free to leave" (D.Mem.9) after he was "briefly seized" by Garcia (*id.*),

and that he was then "free to seek other forms of assistance" (*id.*, quoting *Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir. 1991)). "Free" indeed! Surely an extraordinary description of a man rendered unconscious and helpless by Garcia's brutal beating (what counsel, with equally ironic insensitivity, euphemistically term as Regalado's having been "briefly seized"). Because these facts also bear on the state-created-danger exception in any event, the text will return to this subject in a moment.

This Circuit's caselaw recognized the state-created-danger concept even pre-*De-Shaney*. *White v. Rochford*, 592 F.2d 381 (7th Cir.1979) upheld as viable a Section 1983 claim against police officers who abandoned children on the Chicago Skyway after arresting their custodian and depriving them of adult protection. *Archie v. City of Racine*, 847 F.2d 1211, 1223 (7th Cir.1988) (en banc) also found that a governmental official could be held responsible for creating a danger in a noncustodial setting:

> When the state puts a person in danger, the Due Process Clause requires the state to protect him to the extent of ameliorating the incremental risk.

■ Here Garcia struck Regalado repeatedly and then left him, unconscious, in the care of his drunk friends. Regalado's helplessness was obvious and profound: He remained unresponsive even when a hose was turned on in his pants and his testicles were squeezed (R. 12(N) ¶ 34). Though Garcia put Regalado into serious physical jeopardy, Officers failed to seek medical treatment for a man who clearly could not seek it himself.

D.Mem. 10 urges (citing *Stevens*, 105 F.3d at 1177) that Officers had no duty to Regalado because they did not "cut off all avenues of aid" when they left him in the care of his friends. Even if that were so, it would not be fatal—as *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir.1998) has said:

> In a claim such as this one based on a state-created danger, there is no absolute requirement that all avenues of self-help be restricted.

But the argument is empty to begin with: As n. 9 indicates, by rendering Regalado unconscious Garcia did effectively cut off all avenues of aid that Regalado could seek for himself.

Next Officers argue that even if Regalado has a Fourteenth Amendment claim, they are entitled to summary judgment because Regalado cannot show that they "acted with sufficient culpability." They correctly identify the components of a Section 1983 claim of failure to provide medical care, as summarized by this Court in an in-custody case, *Smallwood v. Renfro*, 708 F.Supp. 182, 187 (N.D.Ill.1989):

1. a serious medical injury *and*

2. defendants' knowledge of the harm and conscious refusal to prevent it.

Yet Officers fail to recognize (or to admit) that genuine issues of material fact exist as to each of those elements.

Reasonable jurors could readily find that Regalado's unconscious state, even after repeated and vigorous attempts to awaken him, indicated a serious medical injury. Furthermore, given that Garcia's actions arguably caused that debilitated state, Officers' knowledge of the harm can readily be inferred. Officers' abandonment of Regalado even after his friends asked them to call an ambulance (R. 12(N) ¶ 37) could also constitute deliberate indifference to his needs in the eyes of a jury.

■ Finally, Officers contend that they are entitled to qualified immunity because they did not violate any clearly established right possessed by Regalado. Qualified immunity shields government officials performing discretionary functions from liability for civil damages. To overcome the defense of qualified immunity, Regalado must show that the officials violated "clearly established statutory or constitutional rights of which a reasonable person would have known" (*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted) refined the concept of "clearly established":

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light

of pre-existing law the unlawfulness must be apparent.

As *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986) has put it, "[t]he right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful."

Here state-created-danger claims were recognized by our Court of Appeals for more than a decade before the 1991 incident between defendants and Regalado, (see *White* and *Archie* ). That being so, there is no question that Officers' actions violated a clearly established right (see also *Monfils,* 165 F.3d at 518, relying on *Byrd* and *Archie* to deny qualified immunity in a state-created-danger case based on a 1992 incident).

This aspect of Officers' Rule 56 motion therefore fails on several fronts. Thus Regalado's Section 1983 claim of failure to provide him with medical services survives.

### State Law Claims of Failure To Provide Medical Care

Officers also seek summary judgment on Regalado's state law claim of failure to provide medical care (Count III), a motion in which City (sought to be held liable on respondeat superior grounds in Count V) also joins. They call upon the immunity provisions of Act §§ 2–202, 4–102 and 4–105:

> *Act § 2–202:* A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct.[10]
>
> *Act ¶ 4–102:* Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure

to identify or apprehend criminals. This immunity is not waived by a contract for private security service, but cannot be transferred to any non-public entity or employee.

> *Act § 4–105:* Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care. Nothing in this Section requires the periodic inspection of prisoners.

 Act §§ 2–202 and 4–105 can be put aside quickly because both contain a "willful and wanton conduct" exception to immunity. As this Court found in *Hvorcik v. Sheahan,* 847 F.Supp. 1414, 1425 (N.D.Ill. 1994), any substantive difference between the content of "deliberate indifference" in the Section 1983 context "and the Illinois reading of 'willful and wanton' ... is so subtle as to defy meaningful application." So because this opinion has already denied summary judgment on the Section 1983 claim of failure to provide medical care, which employs the deliberate indifference standard, it is equally unavailable on the state law claim through Act §§ 2–202 and 4–105.

 Act § 4–102 presents a more complicated analysis, because it does not contain "willful and wanton" language. As definitively taught by *In re Chicago Flood Litig.,* 176 Ill.2d 179, 196, 223 Ill.Dec. 532, 680 N.E.2d 265, 273 (1997) (citations omitted) in addressing another Act section that omitted the "willful and wanton" language:

---

10. Although Act § 2–202 speaks only of public employees and not their governmental employers, Act § 2–109 grants a generic insulation from a "local public entity['s] ... liab[ility] for an injury resulting from an act or omission of its employee where the employee is not liable." Hence to the extent (if any) that Officers are immune under Act § 2–202, City escapes too.

The plain language of section 2–201 is unambiguous. That provision does not contain an immunity exception for willful and wanton misconduct. Where the legislature has chosen to limit an immunity to cover only negligence, it has unambiguously done so. Since the legislature omitted such a limitation from the plain language of section 2–201, then the legislature must have intended to immunize liability for both negligence and willful and wanton misconduct. Cases holding to the contrary are overruled on this point.

In short, *Doe v. Calumet*, 161 Ill.2d 374, 204 Ill.Dec. 274, 641 N.E.2d 498 (1994) and other cases cited by Regalado that read a willful and wanton conduct exception into Act § 4–102 are no longer good law.[11]

Even if that were not so—even if Act § 4–102 were read to provide absolute immunity for all "police protection services"—defendants would still have to surmount the hurdle of bringing the failure to provide medical care, in the circumstances of this case, under that rubric. And at a minimum defendants' ability to do so must be viewed as highly problematic.

Illinois cases interpreting "police protection services" have found that activities such as traffic control, roadway safety and crime prevention fall within that category (see *Dockery v. Village of Steeleville*, 200 Ill.App.3d 926, 146 Ill.Dec. 486, 558 N.E.2d 449 (5th Dist.1990); *Goebig v. City of Chicago*, 188 Ill.App.3d 614, 136 Ill.Dec. 339, 544 N.E.2d 1114 (1st Dist.1989); *In re Estate of Vasconcelles*, 170 Ill.App.3d 404, 120 Ill.Dec. 690, 524 N.E.2d 720 (4th Dist. 1988); *Kavanaugh v. Midwest Club, Inc.*, 164 Ill.App.3d 213, 115 Ill.Dec. 245, 517 N.E.2d 656 (2d Dist.1987); *Lemenager v. Fitzgerald*, 1 Ill.App.3d 803, 274 N.E.2d 913 (3d Dist.1971)). But it has never been determined that Act § 4–102 goes beyond what are traditionally viewed as police

functions to encompass conduct such as a police officer's failure to provide medical care. Both a single Illinois case and the language of Act § 4–105 are instructive on that point.

*Towner v. Board of Educ.*, 275 Ill. App.3d 1024, 212 Ill.Dec. 333, 657 N.E.2d 28 (1st Dist.1995) involved a student's suit against school officials for failing to prevent an injury that resulted from a fight on school grounds. While finding that the charged conduct fell within Act § 4–102's immunity provision because it involved the school's failure to supervise, to provide protection and to prevent crime, *Towner*, *id.* at 1028–29, 212 Ill.Dec. 333, 657 N.E.2d at 32 clearly implied that it might have been a different case had plaintiff shown (rather than merely asserting) that he was injured by a willful and wanton failure to provide medical care. Instead of rejecting that contention outright in statutory immunity terms, the court said (*id.*):

> Under the circumstances, the basic facts appearing in the record plainly establish without reasonable doubt that the Act is applicable to this case with regard to all defendants. It applies to defendant, Board of Education of the City of Chicago, as a local public entity, and defendants, Brister, Harris, and Crayton, as public employees. See 745 ILCS 10/3–108 (West 1992). In an apparent attempt to circumvent the imposition of the Act, plaintiff contends that he was injured because the defendants wilfully and wantonly failed to obtain medical or other emergency assistance for him after he was hit with the golf club. This contention, however, is not supported by the record as a matter of law.

What then followed was a detailed examination of the evidence regarding the medical care issue, rejecting plaintiff's position only on a lack of proof basis. Indeed, the

---

**11.** Although *Cadena v. Chicago Fireworks Mfg. Co.*, 297 Ill.App.3d 945, 955–56, 232 Ill.Dec. 60, 697 N.E.2d 802, 810 (1st Dist.1998) was decided after *Chicago Flood*, it inexplicably states Illinois law inaccurately as to both the willful and wanton misconduct exception and

a special duty exception that had been expressly invalidated a few months earlier in *Harinek v. 161 N. Clark St. Ltd. Partnership*, 181 Ill.2d 335, 230 Ill.Dec. 11, 692 N.E.2d 1177 (1998).

court's analysis of the claim, in much the same terms that the federal courts apply to like Section 1983 claims, buttresses the notion that the "police protection" label simply does not fit.

Some further support for the proposition that the Illinois General Assembly viewed the provision of medical care as being different from general police protection services is found by comparing Act §§ 4–105 and 4–102. If medical care were simply included within police protection, there would appear to have been no need to enact a specialized immunity provision conferring immunity for the failure to provide medical care for persons in custody—for Act § 4–102 would have sufficed for that purpose all by itself. And importantly, Act § 4–105 does not immunize willful and wanton failures to provide such medical care.

In summary, this Court's view is that Regalado's claim does not fall within the ambit of Act § 4–102,[12] but would instead be a candidate for Act § 2–202 or § 4–105 immunity, except that each of those sections includes a willful and wanton conduct exception.[13] Therefore, defendants are not entitled to immunity under the Tort Immunity Act and their motion for summary judgment on Regalado's state claim for failure to provide medical care is denied.

### Dr. Ehle's Testimony and the Causation Issue

■ All defendants argue that Regalado's expert Dr. Ehle should be barred from testifying as to causation because his testimony cannot survive *Daubert* analysis (*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as very recently refined by *Kumho Tire Co. v. Carmichael*, —— U.S. ——, 119 S.Ct. 1167, —— L.Ed.2d —— (1999)). That in turn is said to compel summary judgment rejecting Regalado's claims, because without Dr. Ehle's testimony Regalado cannot prove proximate causation between Officers' actions and his injuries.

Dr. Ehle is a board certified neurologist at Northwestern University where he is Professor of Neurology, Vice Chairman of the Neurology Department and director of the Neurology Residence Program. Dr. Ehle treats patients with brain injuries regularly, has published articles in the fields of neurology and neurophysiology and has additional training and qualifications in clinical neurophysiology (R. 12(N) ¶ 52–53). Understandably, D.R.Mem. 33 acknowledges that "[d]efendants do not quarrel with Dr. Ehle's qualifications, the formal procedures by which he arrived at his medical conclusions, or even the substance of these conclusions themselves." What they "do in fact challenge is Dr. Ehle's ability to testify as [to] what trauma caused Plaintiff's vertebral artery to dissect" (*id.* at 33–34).

Before this opinion examines the issue in *Daubert* terms, it is useful to rehearse what Dr. Ehle has said in his deposition, and will presumably say at trial if given the chance to testify, about the cause of Regalado's brain injuries. Based on Regalado's neurologic examination, the evolution of his CAT scans and the findings of the arteriogram test, Dr. Ehle concluded that Regalado suffered a brainstem stroke (R. 12(N) ¶ 54–55). After ruling out other

---

**12.** This Court acknowledges that only last year, in *Riordan v. City of Joliet*, 3 F.Supp.2d 887, 888–89 (N.D.Ill.1998), it took a "quick look" at Act § 4–102 and expressed a different view in a situation involving police officers' abandonment of an extremely intoxicated individual wearing just a t-shirt, jeans and a corduroy jacket (and with no socks or shoes) in less than 20F̄ weather. But the main focus of that opinion was the recent change in law announced in *Harinek,* and there was no occasion (as exists here) to examine the Act § 4–102 question in depth.

**13.** See also *Davis v. Thillman*, No. 93 C 3335, 1994 WL 14620, at *5 n. 6 (reproduced at *7) (N.D.Ill.Jan.19), holding that state law claims of false arrest and false imprisonment were not governed by Act § 4–102:

This provision, which concerns the adequacy of police protection, and not police misconduct toward an individual, is clearly inapposite in this case.

potential causes for such a stroke (for example, congenital heart disease) based on Regalado's medical history, Dr. Ehle testified that to a reasonable degree of medical certainty he had narrowed the field down to only one possible cause—vertebral artery dissection caused by trauma (Dr. Ehle Dep. 109–13). That dissection occurred, according to Dr. Ehle (*id.* at 60), after a trauma "that basically caused motion of the head in relationship to the trunk that put sufficient stress or tension on one or both vertebral arteries."

Of course Dr. Ehle had not been with Regalado in the days leading up to the stroke, so he could not testify to what trauma in particular caused the vertebral artery dissection (D.12(M) ¶ 49). But Dr. Ehle did testify to a reasonable degree of medical certainty that a strike or strikes to the head (such as the blows administered by Garcia) could have caused the injury, particularly given the fact that the blows were quickly followed by Regalado's losing consciousness (Dr. Ehle Dep. 166–67). Dr. Ehle also testified to a reasonable degree of medical certainty that if Regalado had been treated earlier, it would have lessened the degree of his neurologic outcome (*id.* at 126).[14]

Other possible sources of trauma were not completely ruled out by Dr. Ehle.[15] Nor did he give a pinpoint time for the trauma that he concluded had caused Regalado's stroke, although he ·did narrow down the time frame to no more than one week before the onset of stroke symptoms (D.12(M) ¶ 50). But the jury can consider Regalado's activities in the days leading up to his stroke and determine whether any such other possible incidents actually occurred, thus enabling it to reach a reasoned decision as to whether Regalado has sustained his burden of proving that Garcia's actions proximately caused his injuries.

Fed.R.Evid. ("Evid.Rule") 702 governs the admissibility of expert testimony in federal courts:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Daubert,* 509 U.S. at 589, 113 S.Ct. 2786 interprets Evid. Rule 702 in the context of scientific evidence (a reading left intact ·by *Kumho Tire*) as requiring the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." That category of proffered expert testimony "must be derived by the scientific method," and it must also "fit" the case, in the sense that it will assist the trier of fact in understanding the issues (*id.* at 590–91).

*Wintz v. Northrop Corp.,* 110 F.3d 508, 512 (7th Cir.1997) (citations and quotation marks omitted) has fleshed out the *Daubert*-dictated inquiry into the admissibility of proffered expert testimony:

> First, the district court must consider whether the testimony has been subjected to the scientific method; it must rule out subjective belief ·or unsupported speculation. Second, the district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue.

It takes only a brief run-through to see that those standards are readily met here.

· To begin with, defendants offer nothing to suggest that Dr. Ehle's testimony has not been subjected to the scientific method. Certainly his inability to specify exactly what trauma caused Regalado's

---

14. Because what is said here looks entirely to Dr. Ehle's deposition testimony and not to his later-filed affidavit, it is irrelevant whether— as D.R.Mem. 29–32 contends—that affidavit contradicts or is inconsistent with his earlier testimony.

15. For example, he opined that such things as a visit to a chiropractor, a physical fight, a blow to the chin or being carried without proper head and neck support could have been a source of trauma (D.12(M) ¶ 48).

stroke does not render the rest of Dr. Ehle's testimony either "subjective belief or unsupported speculation." And it is equally certain that his testimony could assist the trier of fact in determining what caused Regalado's stroke, even if it does not provide every link in the chain. In that respect it will surely help the jurors to learn, if they credit Dr. Ehle's testimony, that Regalado's stroke resulted from trauma that could consist of his having been struck on the head by a police officer. Thus it would not at all "confuse and mislead the jurors," as D.Mem. 26 suggests, to allow that expert testimony.[16]

In sum, reasonable jurors could determine from Dr. Ehle's testimony that Regalado's stroke resulted from a trauma like the one inflicted by Garcia. Reasonable jurors could also determine from the testimony of other witnesses that Regalado had experienced no other such trauma, leading to the reasonable inference that his injuries were more likely than not to have been caused by Garcia's actions. Because a genuine issue of material fact thus exists as to whether Garcia's conduct was a proximate cause of Regalado's injuries, defendants' summary judgment motion on causation is denied.

### Conclusion

Defendants' entire summary judgment motion, with the exception of the portion regarding Regalado's assault and battery claim against Acevedo, is denied. Regalado's Section 1983 claims of excessive force and failure to provide medical care, along with his state law claim for failure to provide medical care, will proceed to trial. Dr. Ehle's testimony as to causation will also be admitted at trial.

There is only one exception to the failure of defendants' motion. Because there is no genuine issue of material fact as to Regalado's assault and battery claim against Acevedo, Acevedo is entitled to a

judgment as a matter of law as to that claim. It is dismissed with prejudice.

---

**16.** Indeed, to bar such testimony would invite unanchored speculation on the part of a lay

