In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1487

KATHLEEN PAINE, as guardian of the estate of
Christina Rose Eilman,

*Plaintiff-Appellee*,

*v.*

RICHARD CASON, *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 3173—**Virginia M. Kendall**, *Judge*.

ARGUED SEPTEMBER 20, 2010—DECIDED APRIL 26, 2012

Before EASTERBROOK, *Chief Judge*, and POSNER and
ROVNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Police arrested Christina
Eilman on May 7, 2006, outside Chicago's Midway
Airport. Eilman had arrived from California, her home
state, on May 5, and on May 6 she tried to return. When
a ticket agent at Frontier Airlines told Eilman that she
lacked a reservation, Eilman threw a tantrum and was

escorted from the airport. On May 7 she purchased a ticket from Southwest Airlines but behaved so oddly while waiting to board the airplane that agents called the police, who again escorted her from the airport. (The district court's opinion, 689 F. Supp. 2d 1027 (N.D. Ill. 2010), recounts the details; we provide only an outline.) Eilman walked to the rail and bus terminal of the Chicago Transit Authority, immediately outside the airport, where she started singing loudly, ranting about the price of oil, and screaming at other persons with her face only inches from theirs. She would not or could not stop, despite multiple requests, leading to her arrest.

Eilman, 21 and in college, had been in an auto accident the previous year. She recovered physically but developed bipolar disorder, spending 37 days in a mental hospital. (Whether the accident caused the bipolar disorder or just aggravated an existing condition is not important.) Eilman failed to take prescribed psychotropic medicines and had relapses. Experts in this litigation concluded that, during May 5 to 8, 2006, Eilman was in an acute manic phase. She did not tell the police about her mental-health background, however, and was uncooperative after her arrest—sometimes refusing to answer questions, sometimes screaming, sometimes providing false or unresponsive answers. Phone calls from her mother and her stepfather told officers in Chicago that Eilman had bipolar disorder, but the officers did not believe the stepfather (they thought that the call was fake), and the officer who took the calls from Kathleen Paine, Eilman's mother, failed to tell

anyone else or record the information in Eilman's file. While Eilman was in custody, some officers thought that she was just being difficult, some thought that she was on drugs (expert reports relate that methamphetamine could cause similar symptoms), some thought that she was no worse than the run of loud and uncooperative people who don't want to be in custody, and those who thought that she needed mental-health care were ignored or overruled.

Police took Eilman from Midway Airport to the Eighth District station, at 3515 West 63rd Street, 2.6 miles from the airport by road (as are the other distances in this opinion). She was in custody from midafternoon of May 7 until that evening, when Lt. Earnest, the watch commander, decided that Eilman would be charged and held until she qualified for release on bond. That decision led to Eilman's transfer to the Second District station at 5101 South Wentworth Avenue, about 5.7 miles from the Eighth District station (and 7.3 miles from the airport). The Second District has a holding facility for women; the Eighth District does not. While at the Second District, Eilman alternated between calm and manic conduct, sometimes chatting amiably while sometimes screaming, chanting rap lyrics, smearing menstrual blood on the cell's walls, and taking off her clothes. Officers processed the paperwork to release her on an individual-recognizance bond. Eilman signed the bond at about 6:30 PM on May 8 and walked out of the stationhouse.

She had no idea where she was and did not do the most sensible things—hail a taxi or head for a CTA station

(three were nearby) and get out of the area during the remaining daylight. (Sunset that day was 7:57 PM.) It was evening; the police station was close to the Robert Taylor Homes, a public-housing project with an exceptionally high crime rate; the police had not returned her cell phone, so she could not easily summon aid; she was lost, unable to appreciate her danger, and dressed in a manner that attracted attention (a cutoff top with a bare midriff, short shorts, and boots); and she is white and well off while the local population is predominantly black and not affluent, causing her to stand out as a person unfamiliar with the environment and thus a potential target for crime. Officer Pauline Heard saw Eilman standing, with a puzzled look, in the station-house's parking lot. Heard pointed toward 51st Street. Eilman began walking but did not leave the neighborhood. She stopped in the J & J Fish Restaurant at 5401 South Wentworth. The restaurant's staff and customers have related that she was babbling and acting strangely.



This map shows the location of the police station (the arrow) and the restaurant (the pin); M symbols indicate the nearest CTA stations (bus stops are unmarked); the Robert Taylor Homes were east of Federal Street between 39th and 54th Streets. Chicago began

demolishing the buildings in 2005, but some of the structures were still there in May 2006, with many apartments empty as residents had been evicted in anticipation of the demolition, which was completed in 2007. Vacant apartments, like vacant buildings, render an area more dangerous because such places can become havens for criminals.

Eilman left the restaurant, walked two blocks north (and one block east), and joined a cluster of 15 to 20 people on a street corner outside 5135 South Federal Street, one of the project's high-rise buildings. She accompanied several young men to Apartment 702, which was vacant and had been taken over as a hangout. Some of the occupants told her that it was unsafe and that she should leave, but Eilman was too confused to act on that advice. One man nonetheless led her to his grandmother's house, but when Eilman said that she needed a place to sleep for the night she was returned to Apartment 702. About five hours after the police let Eilman go, Marvin Powell found her there, forced others out, and raped her at knifepoint. People outside tried and failed to break down the door in time to save Eilman. Trying to escape, Eilman jumped out the window, which was seven stories above ground. She may have been pushed or thrown out but cannot tell us what happened, because although she survived the fall her brain was seriously damaged. She has undergone years of physical therapy, but her brain functioning is permanently that of a child. This suit under 42 U.S.C. §1983 against the City of Chicago and 13 police officers (or civilian aides at the police stations) was filed by

Kathleen Paine, Eilman's mother, in her capacity as Eilman's guardian. The district court granted judgment in favor of some defendants but denied others' motion to dismiss. On this interlocutory appeal 10 of the 13 individual defendants contend that they are protected by qualified immunity.

The district court rejected the defendants' claim of immunity because, in the judge's view, detainees' right to medical care is clearly established—and because a reasonable jury could find that Eilman needed care, and the police knew it. An interlocutory appeal from a qualified-immunity decision is limited to legal issues, see *Johnson v. Jones*, 515 U.S. 304 (1995), so we accept the district court's conclusion that Eilman's captors knew that she was mentally disabled (or were reckless in disregarding the signs observable to them). This has allowed us to omit a great deal of factual detail.

Although the district court saw only one legal theory, Paine actually has three, and these require separate treatment. The first theory is the one the district judge discussed: the right to medical care while in custody. The second theory is that Eilman should have been kept in custody longer to facilitate medical care. These theories are related but distinct. The first theory takes the time of release as given and asks what medical treatment is required while custody continues; the second emphasizes the medical care and asks how this affects the time of release. Paine's third theory is that the defendants gratuitously put Eilman in danger by releasing her where and when they did, and in a mental state

that left Eilman unable to protect herself. These three theories have different implications for qualified immunity. We address them in order.

1. Police must provide care for the serious medical conditions of persons in custody. See *Farmer v. Brennan*, 511 U.S. 825 (1994); *Estelle v. Gamble,* 429 U.S. 97 (1976). That right is clearly established. See *Ortiz v. Chicago*, 656 F.3d 523 (7th Cir. 2011) (discussing this duty and why it applies even if the custody is expected to be short). See also *Cobige v. Chicago*, 651 F.3d 780 (7th Cir. 2011). As we have already explained, whether the police should have understood that Eilman *had* a serious medical condition is a factual issue that cannot be decided on an interlocutory appeal.

What appellants say about this theory is not that the law was too uncertain to establish Eilman's right to medical care. It is instead that Paine has not established causation. As appellants see things, Paine's theory is not really that a lack of *medical care* led to Eilman's injury so much as it is a lack of *custody* that did so. That is, Eilman did not suffer (while in custody) a heart attack, appendicitis, or other acute medical episode that caused injury. Her condition was the same before her arrest as it was after her release. Eilman's injury came from what happened after her release, not from the manic episode while in custody.

Causation is another factual issue not suited to resolution on an interlocutory appeal, however. It is not related to the question whether there is a clearly established right to medical care while in custody.

Perhaps lack of causation could be so glaring that the plaintiff would not even have standing to present a particular claim for relief. But we cannot rule out the possibility that Paine could show that Eilman suffered some injury from the manic episode itself during the hours of her custody. More: the rape and brain injury might be traceable to the lack of care while Eilman was in custody. A psychiatrist called to the stationhouse might have administered Eilman's prescribed psychotropic medication, which she had failed to take. This might have enabled Eilman to protect herself after she was released. That plausible theory of causation cannot be rejected on this interlocutory appeal.

2. Paine could have been satisfied had her daughter been released in a way that allowed her to return to California and receive treatment from her own medical providers. Similarly, Paine could have been satisfied had her daughter been kept in a cell until Paine reached Chicago and could escort her home. This leads us to ask whether there is a clearly established right to be held in custody, as distinct from a right to the medical care needed to avoid pain or injury while custody continues. But we start with the question whether the police must protect people from private violence.

*DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), holds that the Constitution does not create a right to be protected from criminal predators. The officers observe that Powell, not the police, assaulted Eilman and insist that there is no right—let alone the sort of clearly established right

needed to overcome a claim of immunity—to be detained. While in a manic phase, Eilman was unable to take care of herself, but three-year-old Joshua DeShaney was even less capable of self-protection; the Justices held in *DeShaney* that neither a potential victim's helplessness nor the state's knowledge that failure to intervene exposes a vulnerable person to a risk of crime requires the state to offer protection.

Had the police honored their duty to provide medical care by referring Eilman for a psychiatric evaluation, she would not have been released where and when she was and would not have been in Apartment 702 the evening of May 8, 2006. That would solve the *DeShaney* problem, but only if there is a right to have custody *extended* in order to provide additional medical care. We do not think, however, that there is a clearly established right to have custody extended for this reason.

The decisions on which Paine relies hold only that care is required for the serious medical needs of those *in custody* (what we are calling Paine's first theory). A contention that the police didn't keep Eilman in custody long enough is fundamentally different. Unlike the arrestee in *Ortiz*, who died while in custody because the police blocked her access to medications, Eilman was released in the same mental condition as when she had been arrested. If the police arrest someone for public drunkenness and discover that he needs dialysis and a liver transplant, they need not extend the custody so that he can receive medical care at public expense; the state is free to let him go in the condition in which he

was found. Similarly when the appropriate medical care is a warm bed. Persons stopped on suspicion of intoxication don't have a "right to be detained" until sober, lest they come to harm while drunk. Paine does not cite, and we could not find, any decision establishing a right to be held in custody pending medical treatment (or even a medical problem's self-resolution, as with the clearance of alcohol from the blood).

Our decision in *Stevens v. Green Bay*, 105 F.3d 1169 (7th Cir. 1997), illustrates the limited force of an argument that police must detain someone for treatment. Stevens, who was drunk, got into a fight in a bar. Bouncers threw him out. Police could have arrested him but chose not to. They drove him to a public phone, from which he could call friends to pick him up. Instead of calling for aid, however, Stevens wandered off and, too intoxicated to protect himself, stepped into the path of a car and was killed. Relying on *DeShaney*, we held that the police did not have any duty to take Stevens into custody or drive him to a hospital; it was enough, *Stevens* concluded, that the police left Stevens no worse off than when they found him. See also, e.g., *King v. East St. Louis School District 189*, 496 F.3d 812 (7th Cir. 2007) (school not required to detain a pupil in order to prevent her from walking through a high-crime neighborhood). If police had stopped Eilman at the airport and released her promptly, with a citation for disorderly conduct, she would not have had a legitimate grievance against the officers had she come to harm at a criminal's hands five hours later. Although *Atwater v. Lago Vista*, 532 U.S. 318 (2001), holds that police are *entitled* to

make custodial arrests for minor offenses, no decision of which we are aware holds that they are *required* to do so, whether or not the person would be better off when in custody than when free.

Doubtless when the police do take someone into custody, prevent him from getting medical care, fail to supply a replacement for that care, and thus cause his condition to deteriorate, there is a constitutional problem—at least when the medical condition is serious and the officers are deliberately indifferent to the problem. So the Supreme Court held in *Farmer*, and its conclusion is equally applicable to pretrial detainees. *Ortiz* is a good example. But Paine does not contend that Eilman would have obtained mental-health care for herself had she been free on May 8, 2006—recall that Eilman had been at liberty for the preceding days yet failed either to seek treatment or take her medications, though Paine's own experts concluded that Eilman had been in an acute manic phase since May 5. Nor does Paine contend that Eilman's mental condition deteriorated because of the custody.

Apart from the principle underlying *DeShaney* and *Stevens*—that the Constitution is a charter of negative liberties rather than a source of rights to protection or treatment—is the fact that a "right to be detained for medical care" would put police in a bind. Evidence in *Portis v. Chicago*, 613 F.3d 702, 704 (7th Cir. 2010), suggests that 10% of all persons arrested in Chicago are drunk or high on drugs, and a similar portion may have some mental illness. Existing law creates a right to be

released on bail (for bailable crimes) as promptly as possible, with 48 hours as the outside time before presentation to a judicial officer who can make an authoritative decision. See *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). When it is possible, police who do not need to hold someone for an appearance in court must release people faster. *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432 (7th Cir. 1986), suggests that in some circumstances even four hours may be excessive. In *Portis* a district court ordered the City to pay damages for not releasing one category of arrestees in less than two hours; we reversed that decision, holding that the sole numerical line is the one from *McLaughlin*, but did not retreat from *Gramenos* and other decisions that the constitutional standard of reasonableness often may call for release before 48 hours.

A competing "right to be detained" would put police in a damned-if-you-do, damned-if-you-don't situation. Officers aren't psychiatrists and would have trouble separating persons who really need mental-health care (or other medical care) from persons who are faking or trying to make pests of themselves. Sending even a modest fraction of arrested persons for mental-health evaluation could swamp medical facilities—police in Chicago make about 250,000 arrests annually, many for minor infractions (such as Eilman's) that ordinarily are followed by prompt release. If the threat of financial liability induces the police to send any significant portion of these to hospitals, the average time in custody will go up (a mental-health evaluation requires two to

seven days, according to expert affidavits in this rec-ord)—and for many of these people the extra time in custody will be unwelcome and unnecessary. In a suit such as this the judges don't see the costs of false positives (people referred for a lengthy evaluation who could have been set free earlier), but they still must consider the deprivation of liberty that these false positives would entail.

What Paine has in mind is a constitutional parallel to the "duty to stabilize" requirement in the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §1395dd. A person who arrives at a hospital's emergency room cannot be released until the medical condition has been stabilized. Legislatures are free to create such entitlements; the judiciary is not supposed to use §1983 in this fashion, as if the Constitution were a source of authority to create a federal common law of torts by public employees and apply it retroactively to police officers who acted six years ago. More: people who present themselves to emergency rooms want medical care, so the problem of false positives is less serious. Many arrested persons desperately want to be released, so they can go home; they would not be made better off by a doctrine that induced police to detain them for mental-health evaluation or emergency-room care whenever there was some question about their physical or mental health.

But we need not and do not decide whether—and, if so, when—there is a constitutional right to have custody prolonged so that more or better medical care may be

provided. This is a qualified-immunity appeal, and the critical question is whether plaintiff's claim rests on a "clearly established" right. See *Messeschmidt v. Millender*, 132 S. Ct. 1235, 1244–45 (2012). Paine relies principally on decisions such as *Farmer* and *Ortiz* that concern medical care during custody. She has not cited, and we did not find, cases establishing (clearly or otherwise) a right to be kept in custody, beyond the time when release otherwise would occur, so that medical care can be provided.

3. We arrive at Paine's third theory. The police arrested Eilman at Midway Airport, where she was safe, and let her go 7.3 miles away, just before nightfall, in a dangerous neighborhood. Data in the record show that sexual assaults are 15 times more common, per capita, in the precinct where Eilman was released than around Midway Airport. And that is the figure for the local populace. Eilman stood out because of her attire and behavior; she was less aware than local residents of the need for precautions and less able to take precautions to the extent that she may have been aware of the need. She was at considerably more than 15 times the risk of a person near Midway Airport. And the police, who not only created the extra risk by moving Eilman but also were aware of the crime problem in and near the Robert Taylor Homes—and, we must assume, aware that Eilman was mentally unstable and unable to protect herself—did nothing to mitigate that risk.

They did not warn Eilman about the neighborhood's dangers. They did not walk her to the nearest CTA

station (parallel to driving Stevens to a phone), from which she could have reached a safer neighborhood in minutes. They did not drive her back to the airport, where she could have used her ticket to return to California. They did not put Eilman in contact with her mother, who had called the stationhouse repeatedly. Her mother could have called a car service to pick Eilman up and drive her to a hotel (or the airport), and told her to remain at the stationhouse until the car arrived. They did not even return Eilman's cell phone, which she could have used to summon aid. They might as well have released her into the lions' den at the Brookfield Zoo. See *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982), which anticipated *DeShaney* but added that throwing someone into a snake pit would violate the due process clause.

It is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution. Some decisions call this a special-relationship exception to *DeShaney*, but we prefer to avoid the jargon. There's no need to hunt for "special relationships" (what makes one "special," anyway?), and it is misleading to treat augmented risk as an "exception" to *DeShaney*. As we've mentioned, *DeShaney* rests on the understanding that the due process clause establishes a right to be let alone, not a right to be assisted. State actors who needlessly *create* risks of harm violate the due process clause by depriving persons of life, liberty, or property without process (no one offered Eilman a hearing on the question whether she should be released in a dangerous place while unable to protect herself).

Several decisions in this and other circuits hold that people propelled into danger by public employees have a good claim under the Constitution. *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979), is an example. Police stopped a car and arrested the driver for drag racing. They took the driver to the police station and left the car, and its three remaining occupants, at the side of the Chicago Skyway, a busy limited-access highway. All three occupants were minors, and two of the three were children. Drag racing is dangerous, but the situation of the children deteriorated when the police took away the driver and left them stranded. When it became too cold for them to stay in the car, they got out, crossed the eight-lane expressway, and went hunting for a public call box. Eventually they phoned home and were picked up. They escaped being hit by a car or attacked and robbed, but one of the three, a five-year-old asthmatic, spent a week in a hospital as a result of the ordeal, and all three suffered fright and other mental distress. They had a good claim against the police who left them in danger. Later decisions show that *DeShaney* did not disturb that conclusion.

For example, *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), holds that police violate the due process clause by arresting the driver of a car and leaving its keys in the hands of an intoxicated adult, who then endangers third parties. (The drunk in *Reed* crossed the center line while speeding and plowed into another car, one of whose occupants died.) *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), also illustrates the principle that officials violate the Constitution by gratuitously increasing the

risks of crime. A police officer stopped a car for driving with its high-beam lights on, arrested the driver, and called for a tow truck to have the car impounded. The officer left the car's passenger stranded in a high-crime area. The passenger walked toward her home until she accepted a ride from an unknown man, who raped her. *Wood* held that leaving the passenger in the lurch violated the due process clause; arresting the driver had materially increased the passenger's risks.

4. A detainee does not have a clearly established constitutional right that release be delayed pending mental-health treatment, but it *is* clearly established that the police may not create a danger, without justification, by arresting someone in a safe place and releasing her in a hazardous one while unable to protect herself, and it is also clearly established that police must arrange for medical treatment of serious conditions while custody continues.

Ten of the defendants have appealed. Some are entitled to immunity under the approach we have taken, some are not, and for two it may be necessary to hold further proceedings to reach a conclusion. We briefly discuss the evidence concerning each of the appellants.

Richard Cason was the arresting officer at Midway Airport. He tried to persuade Eilman to leave the Airport and arrested her only when her disruptive conduct continued. Paine does not deny that there was probable cause to arrest Eilman. Cason told other officers at the Eighth District that Eilman may need medical care.

That his advice was not followed does not support personal liability. Cason is entitled to qualified immunity.

Rosendo Moreno was on duty at Midway Airport and assisted Cason in making the arrest. The record does not show whether Moreno, like Officer Cason, suggested to personnel at the Eighth District that Eilman receive mental-health treatment. But an officer who makes an arrest is not responsible for providing medical care while the person is in custody, or for deciding where and when the person will be released. Moreno is entitled to qualified immunity.

David Berglind, a sergeant at the Eighth District, conducted an intake evaluation of Eilman. He accepted at face value Eilman's statement that she did not require mental-health care (even though Eilman cried and chanted rap lyrics during Berglind's interview of her) and that the pills in her possession were for the control of acne. Actually they were for the control of her bipolar disorder. Berglind did not perform an independent check, though it should have been possible to look up the function of the drugs Eilman was carrying. It is unclear, however, whether Berglind saw the medicine bottles himself; they may have been confiscated by Officer Delia, who is not a defendant. Berglind recommended against summoning a physician or psychiatrist to examine Eilman. Because, as we have already explained, the reasonableness of that conclusion concerns the merits rather than the existence of a clearly established right, Berglind is not entitled to qualified immunity. The possibility that Berglind's superiors

would not have called medical assistance even if Berglind had recommended it also is a question on the merits rather than a basis of qualified immunity.

Carson Earnest, a lieutenant at the Eighth District, was the watch commander and had ultimate responsibility for detainees' safety and welfare. He received conflicting recommendations: Cason told him that Eilman needed a psychiatric evaluation, and Berglind told him that she didn't. He sided with Berglind. It is not clear whether Earnest observed any of Eilman's strange conduct. Earnest treated the call from Eilman's father as a prank; the record does not show why. Although *Johnson v. Jones* puts such factual issues off-limits on an interlocutory appeal, each defendant is entitled to have the district court decide whether he or she violated clearly established rights. On remand, the district court should conduct whatever proceedings are appropriate to determine whether, taking the facts in the light most favorable to Paine, Earnest violated Eilman's clearly established right to medical care while she was at the Eighth District. Earnest can be liable only for what he did; there is no doctrine of supervisory liability for the errors of subordinates such as Berglind. See *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009).

Teresa Williams, the lockup keeper at the Second District, had a role parallel to Berglind's. Like him, she concluded and told her superiors that Eilman did not require medical care. Like Berglind, she is not entitled to qualified immunity.

Pamela Smith was a watch officer at the Second District. She received one of Paine's calls and did nothing in response; she did not even note the call in the log. She was responsible for preparing Eilman's individual-recognizance bond and collecting the possessions that were to be returned on her release. She is potentially liable under both the failure-to-treat and the augmented-danger-on-release theories, and not entitled to qualified immunity on either theory.

Pauline Heard was a lockup officer (apparently a subordinate of Williams) at the Second District. She does not appear to have been responsible for either evaluating Eilman's need for medical care or making the decision to release her. Paine emphasizes, as the basis of Heard's liability, the fact that she pointed Eilman toward 51st Street after her release. Providing walking directions to someone who has already been released on bond does not violate clearly established rights under either the failure-to-treat theory or the augmented-danger theory. Unless the record has other facts that the parties have not discussed, Heard is entitled to qualified immunity.

Sharon Stokes, a detention aide at the Second District, inventoried Eilman's possessions and found the psychotropic medication. She concluded from Eilman's conduct that Eilman "appeared to be irrational" but did not tell her superiors about this conclusion, or about the drugs. She is potentially liable on the failure-to-treat theory and not entitled to qualified immunity.

Cynthia Hudson, a detention aide at the Second District, was responsible for evaluating inmates. Hudson observed Eilman behaving in a mentally unstable way, such as smearing menstrual blood on her cell walls, and Hudson transferred another person out of Eilman's cell because of Eilman's inappropriate behavior. Yet she did nothing to alert other personnel at the stationhouse (or so a trier of fact could conclude). She is not entitled to qualified immunity on the failure-to-treat theory. (She was not involved in Eilman's release.)

Catonia Quinn, another detention aide, had the same duties as Hudson. Like Hudson, Quinn saw Eilman behave in ways that suggested the need for mental-health care. Like Hudson, Quinn did not pass this information to those responsible for making decisions. She is not entitled to qualified immunity on the failure-to-treat theory.

Benita Miller, the desk sergeant at the Second District who ignored a call from Paine and made the decisions not to provide Eilman with medical assistance and to release her without any assistance in getting out of the neighborhood, prevailed in the district court and is not an appellant. 2008 U.S. Dist. LEXIS 91575 at •27–38 (N.D. Ill. Nov. 8, 2008). We do not express any view on whether this part of the district court's decision is sound; resolution of Miller's situation must await an appeal from the final decision.

The narration in this opinion has taken the facts in the light most favorable to Paine; only a trial can determine whether any of the non-immune defendants

is liable. Similarly, a trial would be needed to examine any justifications the defendants may offer for their behavior and any explanations they have for the apparent failure to refer Eilman to a physician or do anything to mitigate the risks she faced when she was turned out the door. The district court's decision is affirmed with respect to six of the appellants, reversed with respect to two, and remanded for proceedings consistent with this opinion with respect to the remaining two.